# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

———————

No. 96-2744

———————

United States of America,          *
                                   *
       Appellee,               *  Appeals from the United States
                                   *  District Court for the
   v.                          *  Eastern District of Missouri.
                                   *
Daniel Basile,                     *
                                   *
       Appellant.              *

———————

No. 96-2746

———————

United States of America,          *
                                   *
       Appellee,               *
                                   *
   v.                          *
                                   *
Richard DeCaro,                    *
                                   *
       Appellant.              *

———————

Submitted:  January 16, 1997

Filed:  April 1, 1997

———————

Before BOWMAN and MURPHY, Circuit Judges, and KYLE,[1] District Judge.


BOWMAN, Circuit Judge.

———————

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, sitting by designation.

Richard DeCaro and Daniel Basile appeal from the judgments of the District Court[2] on jury verdicts finding them guilty on charges of murder-for-hire, conspiracy to commit murder-for-hire, and mail fraud.  We affirm.

I.

This case arises from the execution-style murder of Elizabeth DeCaro, wife of Richard DeCaro, on March 6, 1992.  She was found shot to death that Friday night in the kitchen of her home in St. Charles, Missouri (a suburb of St. Louis), the gun barrel having been pressed up against the back of her neck and fired twice.  Her husband, who recently had been having an extramarital affair with his secretary, had taken the couple's four children (and the family dog, which was not known to travel with the family because it was very excitable around strangers) to the Lake of the Ozarks in south Missouri for the weekend.  He had told Elizabeth that he wanted a "daddy's weekend" alone with the children.  DeCaro and the children left St. Charles shortly after noon on March 6, while Elizabeth was still at work.  Later that afternoon, Elizabeth was murdered and the family's Blazer was stolen from the garage of the home.  These incidents followed by about a month the theft of the family van from the DeCaro home in the early morning hours of February 8, 1992; the van was found in southeast Missouri and had been burned.  DeCaro reported that various items were missing from the van, including the garage door opener for the DeCaro home.

A few days after the murder, first Basile and then DeCaro were arrested on state charges of murder.  In May 1994, Basile was tried as the hit man, was convicted, and was sentenced to death.  His

[2]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

-2-

direct appeal in the state proceeding has been submitted to the Missouri Supreme Court. In a separate trial in September 1994, DeCaro was acquitted on state murder charges.

In May 1995, a federal grand jury indicted Basile and DeCaro on murder-for-hire and mail fraud charges. Specifically, both men were charged with use of the mail or facilities in interstate commerce with intent to commit murder-for-hire, 18 U.S.C. § 1958 (1988 & Supp. IV 1992); conspiracy to commit murder-for-hire, 18 U.S.C. §§ 1958, 371 (1988 & Supp. IV 1992)); and mail fraud, 18 U.S.C. § 1341 (Supp. IV 1992).[3] After a joint jury trial both men were found guilty of all charges against them and each was sentenced to life in prison.

DeCaro and Basile both raise the same three issues on appeal. They claim this federal prosecution, following as it did the state prosecution, is a violation of their rights under the Double Jeopardy Clause of the Constitution. They also argue that the District Court abused its discretion in denying their motions for separate trials. Finally, both challenge the court's denial of their motions for judgment of acquittal, and contend that there was insufficient evidence that interstate facilities were used in furtherance of the murder-for-hire scheme.

---

[3]Basile was charged with and found guilty of two counts of mail fraud based on the filing of fraudulent insurance claims for the loss of the two DeCaro vehicles. DeCaro was charged with and found guilty of those two counts plus three additional counts of mail fraud based on other fraudulent insurance claims filed for the loss of personal property stolen from the DeCaro home at the time of Elizabeth's murder and on a claim filed on a policy insuring Elizabeth's life.

II.

DeCaro and Basile argue that they were twice put in jeopardy for the same crime in violation of their constitutional rights, see U.S. Const. amend. V, and that the District Court erred in refusing to dismiss the indictment on those grounds. We review de novo. See United States v. McMasters, 90 F.3d 1394, 1401 (8th Cir. 1996), cert. denied, 117 S. Ct. 718, 783 (1997).

A.

It has long been the law under the doctrine known as dual sovereignty that federal prosecution following state prosecution "of the same person for the same acts" does not violate the defendant's criminal rights. Abbate v. United States, 359 U.S. 187, 194 (1959); see also United States v. Halls, 40 F.3d 275, 277-78 (8th Cir. 1994), cert. denied, 115 S. Ct. 1721 (1995). According to the tenets of dual sovereignty, each sovereign derives its power from a different constitutional source, so both may prosecute and punish the same individual for the same act. See Abbate, 359 U.S. at 193-94. Basile acknowledges that his federal convictions "do not appear to offend the double jeopardy clause of the Fifth Amendment under current Supreme Court law." Brief of Basile at 31. DeCaro, on the other hand, would have this Court decide that, because federal prosecution for the murder of Elizabeth DeCaro followed his acquittal on state charges for the same act, "the purpose [of the federal prosecution] is improper and the prosecution should be quashed." Brief of DeCaro at 43. We disagree.

The Supreme Court has created an exception to the dual sovereignty doctrine, concluding that a state prosecution will be deemed unconstitutional when "the state prosecution was a sham and

-4-

a cover for a federal prosecution, and thereby in essential fact another federal prosecution." Bartkus v. Illinois, 359 U.S. 121, 124 (1959). Here DeCaro argues the converse: that the federal government was used as a "tool" by state prosecutors after the state prosecution of DeCaro failed, in order to advance a state interest--the conviction of DeCaro for the murder of his wife--where the state could not legally do so itself. See United States v. Talley, 16 F.3d 972, 974 (8th Cir. 1994). As a legal proposition, DeCaro's claim requests an extension of Bartkus, but he directs us to no opinion wherein this Court has held that the Bartkus exception applies when it is the federal prosecution that follows the state prosecution. We acknowledge, however, that other panels of this Court have assumed, without squarely deciding, that a Bartkus-type exception applies to a situation such as we have here. See, e.g., United States v. Williams, 104 F.3d 213, 216 (8th Cir. 1997); Halls, 40 F.3d at 278.

Because the question was not briefed and argued, and because it is not necessary to our holding today, we do not decide how far Bartkus may be extended. For even if DeCaro's claim properly is regarded as falling within the Bartkus exception to the dual sovereignty doctrine, the claim fails for lack of factual foundation. DeCaro has not directed this Court to anything in the record that supports his claim of collusion between the two sovereigns. Indeed, his claim is based on little more than chronology: he was acquitted on state charges, and then later he was tried on federal charges arising from the same events. But it would take far more than mere chronology of this sort to render the federal government a "tool" of the state, or the federal prosecution "a sham and a cover" for a de facto state prosecution.

DeCaro further asserts that the federal prosecution must have been manipulated by the state because the prosecution was for "an

unremarkable case of spousal murder" and "a garden variety contract killing" with "questionable" federal interest.  Brief of DeCaro at 44.  We disagree.  While contract killing, standing alone, may not be a federal crime, it may become such when its perpetration involves the use of the mail or facilities in interstate commerce.  The independence and importance of the federal interest in protecting the channels of interstate commerce from the taint of crime is unaffected by DeCaro's previous acquittal in state court; it remains just as important and worthy of vindication after the state trial as it was before.  "[T]he federal government had an interest, independent of any state interest, to ensure that an individual who is believed to have violated a federal statute is prosecuted for that violation."  Talley, 16 F.3d at 974.

We hold that the dual sovereignty doctrine is fully applicable in this case and that DeCaro's double jeopardy claim therefore lacks merit.

B.

Both DeCaro and Basile argue that the United States Attorney in this case nevertheless violated the constitutional prohibition against double jeopardy by failing to follow an internal United States Department of Justice (DoJ) policy concerning duplicative and successive prosecution by the federal government.  Known as the Petite policy for the case wherein the Supreme Court first described it, see Petite v. United States, 361 U.S. 529, 531 (1960) (per curiam), it "was formulated by the Justice Department in direct response to" the opinions in Bartkus and Abbate, Rinaldi v. United States, 434 U.S. 22, 28 (1977) (per curiam).  Under the policy, a United States attorney may not prosecute a person in federal court "if the alleged criminality was an ingredient of a previous state prosecution against that person" unless the federal

prosecution "is specifically authorized in advance by the [DoJ] itself, upon a finding that the prosecution will serve 'compelling interests of federal law enforcement.'"  Thompson v. United States, 444 U.S. 248, 248 (1980) (per curiam).  DeCaro and Basile argue that the federal government had no "compelling interests" to be served here.

We are not convinced that the federal prosecution in this case failed to meet the "compelling interests" requirement of the Petite policy.  We need not and do not decide the question, however, because the Petite policy is "not constitutionally mandated," Rinaldi, 434 U.S. at 29, and otherwise "confers no substantive rights on the accused," United States v. Moore, 822 F.2d 35, 38 (8th Cir. 1987) (per curiam).  Thus the DoJ's implementation of the policy "cannot form the basis of a claim [by a defendant] that the prosecution was improper." United States v. Lester, 992 F.2d 174, 176 (8th Cir. 1993).  Further, if subsumed in the defendants' argument is the contention that the DoJ improperly waived the policy here, we are without authority to review such a DoJ decision "because the Petite policy is an internal administrative policy." United States v. Kummer, 15 F.3d 1455, 1461 (8th Cir. 1994).

Notwithstanding this Court's continuing affirmation that review of alleged DoJ Petite policy violations is not available  unless sought by the government itself, DeCaro and Basile argue that we should revisit the issue and adopt the reasoning of a concurrence in an Eighth Circuit opinion that predates all of the cases cited above.  See Delay v. United States, 602 F.2d 173, 179 (8th Cir. 1979) (Heaney, J., concurring) (suggesting that Petite policy "should be enforceable by a defendant in an appropriate case"), cert. denied, 444 U.S. 1012 (1980).  It is clear, however, that this is not the direction in which the Court is headed.  See,

e.g., Kummer, 15 F.3d at 1461 (opinion of the Court by Heaney, J.).  And in any event, as a panel we are without authority to overrule precedents established by other panels of this Court; that can be accomplished only by the Court sitting en banc.  See United States v. Knight, 96 F.3d 307, 310 (8th Cir. 1996).

III.

DeCaro and Basile also argue that the District Court erred in denying their motions for severance of their trials.[4]  We will not reverse on this ground unless we find that the denial of severance was an abuse of discretion resulting in "severe or compelling prejudice" to the accused. United States v. Melina, 101 F.3d 567, 571 (8th Cir. 1996) (quoting United States v. Koskela, 86 F.3d 122, 126 (8th Cir. 1996)).

"There is a preference in the federal system for joint trials of defendants who are indicted together."  Zafiro v. United States, 506 U.S. 534, 537 (1993).  A joint trial is especially compelling

---

[4]The government argues that this claim was not preserved for review by either DeCaro or Basile because neither renewed his motion for severance at the close of the government's case or at the end of trial.  (DeCaro did renew his motion at sentencing, but by then it was too late to preserve the issue for review.) Therefore, the government contends, we should review the District Court's denial of the severance motions only for plain error. See United States v. Bordeaux, 84 F.3d 1544, 1547 (8th Cir. 1996).  In his reply brief, DeCaro suggests that the District Court granted him a "continuing motion."  Reply Brief of DeCaro at 3.  As we read the transcript, however, we think it clear that the court granted the defendants continuing objections to evidentiary rulings, not a "continuing motion" for severance. See Trial Transcript at 1-3 ("The requests will be denied with the exception that the objections that are made can be continuing and can apply not only to the opening statement of the government but to the testimony of government as well.") (emphasis added). In any event, our review, whether for plain error or for an abuse of discretion, produces the same result.

when the defendants are charged as co-conspirators, as is the case here. See United States v. Warfield, 97 F.3d 1014, 1018 (8th Cir. 1996), cert. denied, 117 S. Ct. 1119 (1997); Koskela, 86 F.3d at 126.  But whether or not the codefendants also are charged as co-conspirators, "[t]he presumption against severing properly joined cases is strong."  United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir. 1996).  DeCaro and Basile claim, however, that they presented antagonistic defenses, so that trying them together was an abuse of the trial court's discretion and resulted in the necessary prejudice to each to warrant new trials.  We disagree.

In the first place, we are not persuaded that the two defenses are properly characterized as antagonistic.  DeCaro, who testified at the trial, claimed he hardly knew Basile, and denied any participation in the vehicle thefts or the murder.  His strategy was to cast blame on Craig Wells, who was an employee at the Amoco station where DeCaro worked as service manager and who is a relative--of sorts--of Basile.[5]  In support of his theory that Wells may have been involved, DeCaro adduced testimony that Wells had access to the DeCaro vehicle keys and that Wells was a known liar.  DeCaro claimed Wells knew of DeCaro's plans to be out of town on the day of the murder, and there was testimony from one of DeCaro's witnesses that Wells was not at work at the station during the time when the murder may have been committed.  The jury could have drawn the inference that Wells and Basile were the co-conspirators, instead of DeCaro and Basile, with DeCaro making the case against Wells and the government making the case against Basile.  But it is clear from the transcript that DeCaro's counsel did not assume a role as prosecutor by attempting to prove Basile

---

[5]Wells's stepmother was the foster mother of Doug Meyer, Basile's half brother.  Wells and Basile referred to each other as "brother," and some of their acquaintances knew them as brothers.

guilty of the crimes charged.  We do not suggest that DeCaro presented a defense to the government's case against Basile, but he made no concerted effort to depict Basile as the perpetrator of the crimes with which DeCaro himself was charged, to the exclusion of all other possible suspects.

As for Basile, a defense theory was not apparent from the witnesses he called.  Basile did not testify in his own defense and called only two witnesses, both of whom were emergency medical personnel who attended Elizabeth DeCaro at the murder scene and testified as to her condition.  But Basile and DeCaro claim that Basile did have a "defense," and that it was laid out by Basile's counsel in his opening statement and closing argument.  In his comments to the jury, counsel conceded that Basile stole the DeCaro vehicles, but he argued against the prosecution theory that Basile murdered Elizabeth DeCaro, whether with or without the collusion of her husband.  It is clear, however, that during the evidentiary portion of the trial, Basile conceded nothing.  From the trial transcripts it is apparent that Basile's counsel closely cross-examined the witnesses called by DeCaro, including DeCaro himself, as well as those witnesses called by the government, primarily to undermine the government's case as to Basile's involvement in the murder, not to point an accusing finger at DeCaro.

But even if DeCaro's and Basile's defenses were mutually antagonistic, we would not send the case back to the District Court for new trials.  "Mutually antagonistic defenses are not prejudicial per se," Zafiro, 506 U.S. at 538, and even blame-shifting on the part of the defendants "is not a sufficient reason for severance," United States v. Bordeaux, 84 F.3d 1544, 1547 (8th Cir. 1996).  "[C]o-defendants are often hostile to one another, and one will try frequently to 'point the finger,' to shift the blame, or to save himself at the expense of the other." Delpit, 94 F.3d

at 1143. Such tactics rise to the level of antagonistic defenses requiring severance "only when 'there is a danger that the jury will unjustifiably infer that <u>this conflict alone demonstrates that both are guilty</u>.'" <u>Id.</u> (citations to quoted cases omitted) (emphasis in <u>Delpit</u>). Any conflict in the evidence presented at this trial does nothing of the kind, but simply is indicative at most that each defendant was attempting to save his own skin by diverting the jury's attention to the other.

To demonstrate the severe or compelling prejudice necessary to show that the court abused its discretion in denying severance, "a defendant must show that his defense was irreconcilable with that of the codefendant or that the jury was unable to compartmentalize the evidence." <u>Bordeaux</u>, 84 F.3d at 1547. As demonstrated by our discussion above, we do not believe that the defenses of DeCaro and Basile (to whatever extent Basile actually put on a defense) were so antagonistic as to be irreconcilable. Because there was no serious finger-pointing by the defendants toward one another during the evidentiary phase of the trial, notwithstanding some desperation blame-shifting by counsel in closing arguments, the jury in its deliberations might have bought into DeCaro's defense, or Basile's "defense," or both--or neither. Further, having reviewed the entire transcript, we are satisfied that the jury could not have had any difficulty compartmentalizing the evidence against each defendant. There were only two defendants, the charges varied little between DeCaro and Basile and were not complicated, and the issues were not complex. We conclude that neither DeCaro nor Basile has met his heavy burden of demonstrating the prejudice required for reversal. <u>See</u> <u>United States v. McGuire</u>,

-11-

45 F.3d 1177, 1187 (8th Cir.), <u>cert. denied</u>, 115 S. Ct. 2558 (1995).[6]

IV.

Both DeCaro and Basile argue that the evidence was insufficient to prove the necessary interstate activity to support federal charges and that the District Court therefore erred in denying their motions for acquittal. DeCaro and Basile do not claim that the evidence was insufficient to prove that DeCaro hired Basile to murder Elizabeth DeCaro, nor do they challenge the mail fraud convictions related to the filing of insurance claims. Instead, their sufficiency argument is limited to the issue of whether the government proved the requisite connection between the use of the mail or facilities in interstate commerce and the murder-for-hire plot.

"Our standard of review on this issue is quite narrow." <u>United States v. Smith</u>, 104 F.3d 145, 147 (8th Cir. 1997). We view the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence. After reviewing the evidence under these standards, we will reverse only if we conclude that no reasonable jury could find guilt beyond a reasonable doubt. We may affirm even if the evidence is entirely circumstantial. <u>See</u> <u>id.</u>

_____

[6]The government also argues that several of the instructions given by the court cure any prejudice that may have resulted from the joint trial, citing <u>Zafiro v. United States</u>, 506 U.S. 534, 539 (1993). The record furnished by the parties is incomplete on this point, as copies of the relevant instructions were not included, so we do not rely on this for our holding.

The relevant part of the statute under which DeCaro and Basile were convicted in their murder-for-hire scheme reads as follows:

> Whoever . . . uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, . . . if death results, shall be subject to imprisonment for any term of years or for life, or shall be fined not more than $50,000, or both.

18 U.S.C. § 1958(a) (1988). The government included in its addendum a copy of jury Instruction 31, which was given without objection to the legal elements. Instruction 31 states that the use of the mail or a facility in interstate commerce with intent to commit murder-for-hire can be established upon proof that "the mail or a facility in interstate commerce was used as part of the course of activity charged . . . and that one of the reasons for this use was to further the activity described." Neither defendant having raised a challenge to the legal elements set forth in the instruction, we consider whether, in keeping with the instruction, the evidence presented at trial is sufficient to prove that the interstate transactions at issue were a part of and in furtherance of the murder-for-hire scheme.

The evidence, viewed under the standards mentioned above, shows that, in collaboration with DeCaro, Basile stole the DeCaro van from the driveway of the home, drove it to southeast Missouri, and burned it, all late one night about one month before the murder. He also stole the family Blazer from the home the afternoon of the murder, stashed it in a garage his half brother Doug Meyer let him use, and cut it up for parts in the days following the murder. Additionally, Basile stole items of value

-13-

from the van before he burned it,[7] and from the DeCaro home on the day he murdered Elizabeth.  There was uncontroverted evidence that, as a direct result of the thefts, in February 1992 DeCaro filed insurance claims via the mail for the stolen van and for the items purportedly stolen from the van, and that in 1995 (after he was acquitted on state charges of murder) he filed insurance claims for the stolen Blazer and the items stolen from the home.  The insurance company mailed him checks, which he cashed, for some of the claims.  Interstate telephone calls and faxes also were exchanged between DeCaro and insurance company representatives regarding some of the claims.  In addition, late in December 1991 an application for an insurance policy on the life of Elizabeth DeCaro in the amount of $100,000, naming Richard DeCaro as sole beneficiary, was mailed to the same insurance company that wrote the property policies.  A confirmation for the policy showing an effective date of January 9, 1992, just days before DeCaro began casting about for someone to murder his wife and less than two months before the murder occurred, was mailed back to the DeCaros and was found in the DeCaros' bedroom after the murder.  DeCaro used the mail to make a claim on that policy early in 1995, after his acquittal on state murder charges and his release from incarceration.  This constituted the government's evidence on the use of the mail or facilities in interstate commerce.  We consider the arguments of each of the defendants in turn.

A.

Basile, while acknowledging that "it can be said that [his] admitted theft of the van 'caused' DeCaro to use the mails to make

---

[7]There was evidence at trial that some of the items Basile supposedly removed from the van, and for which DeCaro claimed and received insurance reimbursement, were found in the DeCaro home when authorities were investigating Elizabeth's murder.

-14-

insurance claims on the van and its contents," nevertheless argues that "these claims . . . were not linked by the evidence to the alleged murder contract between the two." Brief of Basile at 26. We disagree, and now summarize additional relevant evidence.

Craig Wells testified that, in late January 1992, Basile told him that DeCaro wanted Basile "to steal one of his vehicles and also that he wanted him to do a hit" on DeCaro's wife. Trial Transcript at 1-156. According to Wells, Basile "thought it was a package deal" and that DeCaro was going to pay Basile "around $15,000." Id. at 1-156, -157. Susan Jenkins, who was Basile's driver the night he stole the van, testified that the theft was an "insurance scam" and that, during the course of their time together that night, she heard Basile say "that he had been offered $15,000 to kill someone's wife." Id. at 2-17, -18. Jeffrey Niehaus, a friend of Basile, said Basile told him that the van theft "was set up through the owner and it was insurance" and that Basile referred to stealing the van as part of a "double job." Id. at 2-189. Basile also told Niehaus that Basile would be receiving "[o]ver $9,000" for stealing the Blazer, which Niehaus thought was an "[a]wfully lot" of money for just stealing a car. Id. at 2-191. Kenneth Robinson, an acquaintance of Basile, testified that Basile said that "he knew someone who had a van that he wanted to get rid of and have his wife disappear at the same time." Id. at 4-256. Basile's friend Dennis Williams testified that, after the murder, Basile told Williams "that he had recently done an insurance job on a van for [murder victim Elizabeth DeCaro's] husband." Id. at 4-250. In addition, Basile told his half brother Doug Meyer that "he was doing an insurance job" when Meyer saw the cut-up Blazer in the garage he had let Basile borrow and realized that the vehicle was implicated in the DeCaro murder. Id. at 4-23. There was no evidence that Basile received from DeCaro anything more than several hundred dollars before the murder. But there was evidence

that DeCaro was not in good financial shape at the time of the murder, and that he would not have been able to pay Basile $15,000 in cash (or $9,000, for that matter) without the proceeds from the insurance on Elizabeth DeCaro's life.

Having reviewed the evidence according to the standards discussed above, we conclude that the insurance transactions involving the DeCaro vehicles and items taken from the DeCaro van and home provide the required nexus between the mail or facilities in interstate commerce and the murder-for-hire to sustain Basile's conviction. It does not appear, and the government does not contend, that the insurance proceeds from the property insurance policies were to be used to pay Basile for killing Elizabeth, given that the funds were not sufficient to do so. There was a substantial lien on the van, and the value of the stolen property and the Blazer was not enough to cover the price of the murder contract. As explained below, the evidence nevertheless was sufficient to prove that DeCaro filed the property insurance claims, at least in part, in order to cover the co-conspirators' involvement in the thefts, which themselves occurred as a part of the plot to murder Elizabeth DeCaro--in the words of Basile, "the package deal."

After Elizabeth was killed, DeCaro told Elizabeth's sister that the murderer must have been "casing the joint." Trial Transcript at 3-51. The jury reasonably could infer from that testimony that the theft of the van was staged to create a scapegoat, that is, an unknown assailant who just a month before the murder had "cased" the DeCaro home when stealing the van. As for the Blazer, the evidence was substantial that the vehicle was stolen, at least in part, to be used as Basile's "getaway" vehicle

-16-

after he murdered Elizabeth DeCaro in her home.[8]  Thus a reasonable jury
could conclude that the thefts of the vehicles were part of the murder
plot, and that the insurance claims were filed, not merely for the sake of
collecting the insurance money, but to give DeCaro the appearance of
innocence.[9]  The evidence of the requisite nexus between the use Basile
caused to be made of the mail or facilities in interstate commerce and the
murder-for-hire plot, while circumstantial, is sufficient for a reasonable
jury to find the requisite linkage between Basile, the interstate activity
of his co-conspirator, and their contract for the murder of Elizabeth
DeCaro.

We hold that the District Court did not abuse its discretion in
denying Basile's motion for judgment of acquittal on the murder-for-hire
charges.

B.

DeCaro, like Basile, acknowledges his use of the mails and facilities
in interstate commerce but challenges the sufficiency of the government's
proof that such use was in furtherance of the murder-for-hire plot.  The
analysis above concerning Basile applies with even greater force to DeCaro.
Moreover, DeCaro's interstate

---

[8]Basile does not "admit" in his brief that he stole the
Blazer as he did the van, but the evidence presented at trial
provides overwhelming proof that he did.  Therefore, the Blazer's
role in the murder, and the interstate transactions related to
its theft, are relevant to the analysis.

[9]DeCaro did not file the claims on the Blazer and the
property stolen from his home until after his release by state
authorities following his acquittal on murder charges, but those
transactions could be seen by a reasonable jury as a part of
DeCaro's continuing effort to appear innocent of his wife's
murder.

-17-

activity concerning the life insurance policy provides an additional interstate connection to the murder plot. The government has the benefit of the logical inference that the purchase of the policy on Elizabeth DeCaro's life was an integral part of DeCaro's scheme to have her murdered. Further, the evidence permits the inference that DeCaro, otherwise lacking the ability to pay Basile for his services, intended to pay him when DeCaro collected the $100,000 on the life insurance policy.

We hold that the District Court did not err in denying DeCaro's motion for judgment of acquittal, as a jury could find beyond a reasonable doubt the necessary connection between his use of the mail or facilities in interstate commerce and the murder-for-hire scheme.

V.

The judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT