# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

No. 98-1226SD

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota |
| Randy Phelps, | * | |
| | * | |
| Appellant. | * | |
| | * | |
| | * | |

The clerk is directed to vacate the panel's January 4, 1999, opinion in this matter. The clerk shall issue the attached corrected and clarified opinion in its stead. The judgment issued on January 4, 1999, remains in effect.

The corrected and clarified opinion issued this date makes non-dispositive changes in the court's earlier opinion and does not affect the outcome of the case. As a result, the issuance of this corrected and clarified opinion does not trigger a new period for the filing of rehearing petitions. The pending rehearing and rehearing en banc petitions are not affected by this order.

February 4, 1999

Order entered under Rule 27B

Clerk, U.S. Court of Appeals, Eighth Circuit.

# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

———————

No. 98-1226

———————

United States of America,            \*

                                    \*

          Appellee,       \*

                                    \*   Appeal from the United States

     v.                        \*   District Court for the

                                    \*   District of South Dakota.

Randy Phelps,                \*

                                    \*

          Appellant.      \*

———————

Submitted: October 20, 1998

Filed: February 4, 1999

———————

Before BOWMAN, Chief Judge, BRIGHT, and RICHARD S. ARNOLD, Circuit Judges.

———————

BOWMAN, Chief Judge.

The appellant, Randy Phelps, was convicted by a jury of assault with a dangerous weapon, in violation of 18 U.S.C. §§ 113(a)(3) and 1153, and use of a firearm in a crime of violence, in violation of 18 U.S.C. §§ 113(a)(3) and 1152. Phelps was sentenced to 81 months in prison. Phelps appeals, raising seven issues: (1) that his prosecution in federal court violated the Double Jeopardy Clause because he had already been prosecuted in a tribal court; (2) that the District Court[1] did not have jurisdiction over him because the land on which he resided was not part of the

———————

[1]The Honorable John B. Jones, United States District Judge for the District of South Dakota.

Yankton Sioux Indian Reservation; (3) that the District Court abused its discretion by admitting several statements under the excited utterance exception to the rule against hearsay; (4) that the evidence was not sufficient to support his convictions; (5) that the District Court gave several erroneous jury instructions; (6) that the District Court erred when it found that the officer's entrance into Phelps's home was consensual; and, (7) that the District Court erred by admitting evidence relating to Phelps's actions immediately before and after the shooting. For the reasons set forth below, we affirm Phelps's convictions.

## I.

Phelps is a Caucasian male, who resides in Greenwood, South Dakota. Phelps leased a house which is located on a tract of trust land that is owned by the Yankton Sioux Indian Tribe. Phelps shared this house with his girlfriend, Shannon Keeler, and her two sons. The convictions in this case arose out of Phelps's acts on November 30, 1996, when Phelps fired several shots at Keeler and her sons after an argument with Keeler.

On December 5, 1996, Phelps was arraigned in the Yankton Sioux Tribal Court for aggravated assault and possession of a weapon by an intoxicated person, in violation of the Yankton Sioux Law and Order Code 3-14-2 and 3-11-9. Phelps pled guilty to both counts and a judgment of conviction was entered by the tribal court on December 6, 1996.

On February 14, 1997, a federal indictment was filed in the United States District Court for the District of South Dakota charging Phelps with assault with a dangerous weapon, in violation of 18 U.S.C. §§ 113(a)(3) and 1153, and use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 113(a)(3) and 1152. These charges arose from the November 30 shooting. Phelps filed a motion to dismiss the indictment, arguing that his prosecution in both tribal and federal court for the same conduct violated the Double Jeopardy Clause. The District Court denied

his motion. On October 23, 1997, a jury found Phelps guilty of both federal charges. These federal convictions are the subject of Phelps's appeal. The following is a summary of the evidence that was admitted in Phelps's federal trial.

On November 30, 1996, Phelps returned home, and began to argue with Keeler. Phelps told Keeler that he wanted her out of his house permanently. Phelps was swearing at her and speaking loudly. Keeler thought that he might have been drinking. She asked for keys to the car so she could leave, and he threw them at her. As Keeler bent over to pick up the keys, Phelps pointed a small gun at her and told her to leave again. She and her sons left the house and got into a brown Skylark, but were unable to leave because Phelps had given Keeler the wrong keys. As they exited from the car, Phelps came out of the house, carrying a larger gun. Keeler and the children ran towards a neighbor's house. As she was running, Keeler heard a gunshot. She pushed her children to the ground and fell on top of them to protect them. Keeler heard five to six gunshots. The shots were fired by Phelps, who was standing approximately 257 yards away from Keeler and the children.

When Keeler arrived at her neighbor's house, she called 911. There was conflicting testimony at trial regarding Keeler's 911 phone calls. Tiphany Dvorak, the 911 dispatcher, testified that Keeler had called 911 twice. Dvorak testified that during the first call, Keeler stated that someone was shooting at her and requested police assistance. During both calls, Keeler sounded upset and there was crying in the background. When asked if she thought that Keeler had been "making more of [the incident] than what it really was," Dvorak testified that "it sounded pretty bad." Trial Tr. at 108. Dvorak's testimony was admitted under the excited utterance exception to the rule against hearsay.

In contrast to Dvorak's testimony, Keeler testified that she had called 911 three times. She testified that in her first call, she had requested assistance to retrieve her belongings from Phelps's house and that the dispatcher did not offer assistance. Keeler testified that she repeated her request during the second call and still received

no assistance. Keeler then claimed that she was frustrated because an officer had not been dispatched, so she called a third time and said that someone was shooting at her.

Keeler also had called a relative, Nancy Cooke, shortly after the shooting. Keeler spoke to Cooke for several minutes. Keeler told Cooke that she needed a ride out of Greenwood and that she needed "to get out of here fast." Trial Tr. at 111. At trial, Cooke testified that Keeler had sounded out of breath, scared, and nervous throughout their conversation. Cooke had known Keeler for many years and testified that she did not usually sound this way. Cooke's testimony was admitted under the excited utterance exception to the rule against hearsay.

Officer Russell Leaf testified that he arrived on the scene approximately 15 minutes after receiving a phone call from Cooke. Leaf testified that he spoke to Cooke for several minutes and then saw Keeler and her sons walk out from a field. Leaf testified that he spoke to Keeler, who was very upset. Her hands were shaking, and she and the children were crying. Keeler told Leaf that her boyfriend had tried to shoot her and had threatened to use her and the children for target practice. Leaf repeatedly urged her to calm down, but she remained upset throughout her description of the shooting. Keeler was adamant that Phelps had been pointing a gun at her and stated that the shots had been fired from right behind her. Leaf testified about Keeler's statements under the excited utterance exception to the rule against hearsay.

Shortly after the shooting, and while Leaf was speaking to Keeler, Phelps arrived on the scene. He was angry and belligerent. Leaf placed Phelps under arrest, and Phelps asked Leaf to secure his house. There was conflicting testimony regarding Phelps's exact words regarding his consent to enter the house. Phelps testified that he intended for his consent to be limited to boarding up a broken window. Leaf testified that Phelps asked him to secure his house and to remove any intruders. While Leaf secured the house and checked each room for intruders, he discovered a 12-gauge Mossberg shotgun, another shotgun, and shotgun shells in plain view. This evidence was admitted at trial over Phelps's objection.

At the close of the trial, a jury found Phelps guilty of both charges, and Phelps was sentenced to 81 months in prison.

## II.

### A.

The first issue Phelps raises on appeal is that his prosecution in federal court violated the Double Jeopardy Clause because he had been prosecuted in a tribal court for the same conduct. Phelps's argument is based on this Court's decision in United States v. Weaselhead, 156 F.3d 818 (8th Cir. 1998). In Weaselhead, we held that the Double Jeopardy Clause bars the federal prosecution of a Native American who previously has been tried for the same conduct by a tribal court of which he was not a member. Id. at 824. The Court recently has granted the government's petition for rehearing en banc in Weaselhead, and the panel opinion thus has been vacated. We review Phelps's Double Jeopardy claim de novo. See United States v. Basile, 109 F.3d 1304, 1306 (8th Cir.), cert. denied, 118 S. Ct. 189 (1997).

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Protection from double jeopardy is fundamental to the American justice system. See United States v. Dixon, 913 F.2d 1305, 1309 (8th Cir. 1990). The Double Jeopardy Clause, however, "does not come into play until a proceeding begins before a trier 'having jurisdiction to try the question of guilt or innocence of the accused.'" Serfass v. United States, 420 U.S. 377, 391 (1975) (quoting Kepner v. United States, 195 U.S. 100, 133 (1904)). Because Phelps is Caucasian, rather than Native American, the Yankton Sioux Tribal Court did not have jurisdiction to enforce tribal laws against him. Indian tribal laws are enforceable against Indians only, not against non-Indians. See Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 205 (1978). Because the Yankton Sioux did not have

jurisdiction to prosecute Phelps in tribal court, the Double Jeopardy Clause was not violated by Phelps's prosecution in federal court.

## B.

The second issue Phelps raises on appeal is that the District Court did not have subject matter jurisdiction over his case because the offense did not occur in Indian Country. Federal courts have jurisdiction over offenses committed in Indian Country. 18 U.S.C. § 113 (1994). Indian Country is defined as "all land within the limits of any Indian reservation under the jurisdiction of the United States" and "all Indian allotments, the Indian titles to which have not been extinguished." 18 U.S.C. § 1151 (1994).

Prior to trial, Phelps filed a motion to dismiss his indictment, arguing that the District Court did not have subject matter jurisdiction over the case. The District Court denied his motion, citing Yankton Sioux Tribe v. Southern Missouri Waste Management Dist., 99 F.3d 1439 (8th Cir. 1996), which subsequently was reversed by the Supreme Court. See South Dakota v. Yankton Sioux Tribe, 118 S. Ct. 789 (1998). Phelps contends that his indictment should be dismissed or remanded to the District Court for an evidentiary hearing in light of the Supreme Court's holding.

Phelps's argument is without merit. Phelps assaulted Keeler on a tract of tribal trust land owned by the Yankton Sioux Tribe. The Supreme Court's decision in Yankton Sioux Tribe has no bearing on whether these particular lands are Indian Country under § 1151. Therefore, the District Court had subject matter jurisdiction over Phelps, and his motion to dismiss properly was denied.

## C.

The third issue raised by Phelps is that the District Court abused its discretion when it admitted the testimonies of Tiphany Dvorak, Nancy Cooke, and Officer

–7–

Russell Leaf under the excited utterance exception to the rule against hearsay. The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is inadmissible unless it falls under one or more exceptions. See Fed. R. Evid. 802. One such exception is for an excited utterance, which is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2).

> To determine whether the declarant was still under the stress of excitement caused by the assault when he made the statement, we must consider the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement.

United States v. Moses, 15 F.3d 774, 777-78 (8th Cir. 1994). In order for Rule 803(2) to apply, "it must appear that the declarant's condition at the time of such statement was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation." United States v. Iron Shell, 633 F.2d 77, 86 (8th Cir. 1980), cert. denied, 450 U.S. 1001 (1981). We review the admission of this evidence only for abuse of discretion. See id.

As to the testimony of Tiphany Dvorak under the excited utterance exception to the rule against hearsay, Dvorak testified that Keeler called 911 twice, reporting that someone had been shooting at her and requesting police assistance. Dvorak testified that Keeler sounded very upset and that the situation "sounded pretty bad." Trial Tr. at 108. The evidence did not establish that any appreciable amount of time had elapsed between the shooting and Keeler's phone calls to 911. Keeler's statements to Dvorak were made shortly after Phelps had fired a gun at Keeler and her sons, Keeler sounded upset during the phone calls, the characteristics of the shooting are such that an ordinary person would have been startled, and the statements

-8-

concerned the shooting. In these circumstances, the District Court did not abuse its discretion when it permitted Dvorak to testify about Keeler's phone calls to 911.

Likewise, the District Court did not abuse its discretion when it admitted the testimony of Nancy Cooke under the excited utterance exception to the rule against hearsay. Cooke testified that Keeler had called her to request a ride out of Greenwood and that Keeler stated she needed to get "out of here fast." Trial Tr. at 111. Cooke stated that she had known Keeler all of her life, and that during the phone call, Keeler spoke quickly, was out of breath, and sounded scared and nervous. Cooke testified that this was not how Keeler usually sounded when they spoke. Keeler called Cooke immediately after she called 911, so there was not an appreciable amount of time between the call and the shooting. Keeler's statements to Cooke were not in response to an inquiry, and Keeler sounded scared and upset during the phone call. Keeler's statements were related to the shooting incident and shared identical characteristics to Keeler's phone calls to 911. The District Court did not abuse its discretion when it admitted Cooke's testimony.

Finally, the District Court did not abuse its discretion when it admitted Officer Leaf's testimony under the excited utterance exception to the rule against hearsay. Leaf testified that he arrived at Cooke's home within 15 minutes of Cooke's phone call requesting assistance and spoke to Keeler only minutes after his arrival on the scene. The lapse of 15 to 30 minutes between an exciting incident and a statement does not render the statement inadmissible. See Iron Shell, 633 F.2d at 86 (holding statements elicited by a police officer between 45 minutes and one hour and 15 minutes after an assault were admissible). When Keeler spoke to Leaf about the shooting, she was visibly distraught. Keeler was crying and her hands were shaking. Each time Keeler began to talk to Leaf about the shooting, she began to cry, despite Leaf's attempts to calm her down. Keeler's statements to Leaf were not made in response to suggestive questioning. Keeler's statements occurred only shortly after an exciting event, were made while she was still visibly upset from the shooting, and described the shooting. It was not an abuse of discretion, in these circumstances, for

the District Court to find that Keeler was in a state of continuous excitement from the shooting and to admit Leaf's testimony.

## D.

The fourth issue Phelps raises on appeal is that there was insufficient evidence to sustain his conviction for assault with a dangerous weapon under 18 U.S.C. § 113(a)(3). Phelps contends that a shotgun fired at a distance of 257 yards cannot be a dangerous weapon because Keeler and her sons could not have been injured by the gun's pellets at that distance. At the close of evidence, Phelps moved the District Court to acquit him on that basis, and the District Court denied his motion.

The District Court properly denied Phelps's motion for acquittal. The issue of what constitutes a dangerous weapon in a particular case is a question of fact for the jury. See United States v. Moore, 846 F.2d 1163, 1166 (8th Cir. 1988). In this case, there was conflicting evidence regarding whether the shotgun's pellets could have injured Keeler and her sons. Thus the issue was properly submitted to the jury. Upon weighing the evidence in this case, the jury found that Phelps was guilty of assault with a deadly weapon. A jury verdict "should not be overturned lightly." United States v. Scott, 64 F.3d 377, 380 (8th Cir. 1995) (internal quotation and citation omitted).

"In reviewing the sufficiency of the evidence on appeal, the court views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." Scott, 64 F.3d at 380 (internal quotation and citation omitted). To sustain a conviction under 18 U.S.C. § 113(a)(3), the government must prove:

> 1) that the victim was assaulted, 2) with the use of a dangerous weapon, and 3) with the intent to inflict bodily harm. An assault is any intentional and voluntary attempt or threat to do injury to the person of

another, when coupled with the apparent present ability to do so
sufficient to put the person against whom the attempt is made in fear of
immediate bodily harm.

United States v. LeCompte, 108 F.3d 948, 952 (8th Cir. 1997). The government is required to present sufficient evidence only that the appellant assaulted the victim with an object capable of inflicting bodily injury, and not that the victim actually suffered bodily injury as a result of the assault. Id. at 952-53.

Here, the evidence presented by the government, viewed in the light most favorable to the verdict, is sufficient to support Phelps's conviction. The evidence supports the jury's determination that Phelps assaulted Keeler. Testimony was presented that Phelps pointed a gun at Keeler while she was inside the house and that he ordered her to leave. He then stood on the porch, pointed a larger gun at her and her sons, and threatened to use them for target practice. Phelps then fired the gun in their direction. Keeler clearly felt endangered, as was evident when she pushed her sons to the ground and laid on top of them to protect them. Based on this evidence, the jury reasonably could have inferred that an assault had occurred.

The evidence also supports the jury's determination that Phelps used a dangerous weapon to carry out the assault. Although experts testified that it was unlikely that the pellets from a 12-gauge Mossberg shotgun would travel 257 yards, another witness testified that, in his personal and professional opinion, pellets could travel much greater distances than those claimed by the experts. In addition, based on the evidence, the jury could have determined that Keeler was closer than 257 yards at the time Phelps fired the shots. Viewed in the light most favorable to the verdict, the facts are sufficient to support Phelps's conviction for assault with a dangerous weapon.

**E.**

The fifth issue raised by Phelps on appeal is that the District Court abused its discretion when it refused to give the jury an instruction regarding his intoxication at the time of the shooting. Phelps claims that the trial court should have instructed the jury on intoxication as a defense to assault with a dangerous weapon because the offense includes the element of specific intent to do bodily harm.

A criminal defendant is entitled to an instruction on a theory of defense only if there is adequate evidence in the record to justify it. United States v. Fay, 668 F.2d 375, 377 (8th Cir. 1981). An intoxication instruction should not be given if it lacks evidentiary support or is based on mere speculation. United States v. Lavallie, 666 F.2d 1217, 1219 (8th Cir. 1981).

In the present case, some evidence was presented that Phelps had been drinking. Testimony revealed that his eyes appeared bloodshot and that he was carrying alcoholic beverages with him. In addition, Keeler testified that she thought that Phelps had been drinking. However, there was also evidence that Phelps was not intoxicated. Keeler's mother, who knew Phelps well, testified that she had seen him immediately after the shooting and that she did not think that he had been drinking. She stated that he seemed calm and was acting normally. Further, none of the witnesses testified that Phelps was staggering or slurring his words. Thus, although there was some evidence that Phelps had been drinking, the evidence would not support a finding that he was intoxicated. Therefore, the District Court did not abuse its discretion by denying Phelps's request for an intoxication instruction.

Phelps also challenges several of the other jury instructions given in his trial. Phelps alleges at least ten errors in the District Court's jury instructions, many of which stem from the District Court's refusal to give the instructions suggested by Phelps. "When reviewing a challenge to the jury instructions, we recognize that the district court has wide discretion in formulating the instructions and will affirm if the entire charge to the jury, when read as a whole, fairly and adequately contains the law applicable to the case." United States v. Casas, 999 F.2d 1225, 1230 (8th Cir. 1993),

-12-

cert. denied, 510 U.S. 1078 (1994).  We have reviewed the jury instructions and are satisfied that, viewed in their entirety, they fairly and adequately contain the law applicable to the issues in the case.  Therefore, the District Court did not err in its instructions.

## F.

The sixth issue Phelps raises on appeal is that the District Court erred when it denied Phelps's motion to suppress two shotguns and shotgun shells discovered in plain view while Officer Leaf was in Phelps's home.  At the suppression hearing, there was conflicting testimony regarding what Phelps had said to Leaf.  Phelps testified that he gave Leaf permission to enter his home, but that this consent was limited to allowing Leaf to board up a broken window.  In contrast, Leaf testified that Phelps asked him to secure the premises, and said, "[I]f anybody is in there, I want them out of my house."  Hearing Tr. at 45, 53.  The magistrate judge found Leaf's testimony to be more credible.  Determinations regarding credibility are "virtually unreviewable on appeal."  Black, 88 F.3d at 680.

The test for determining whether an officer has exceeded the scope of a suspect's consent to enter the suspect's premises "is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  United States v. Sanchez, 32 F.3d 1330, 1334 (8th Cir. 1994) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)), cert. denied, 513 U.S. 1158 (1995).  In this case, the District Court  properly found that it was objectively reasonable for Leaf to interpret Phelps's statements as giving his consent to allow Leaf to enter his home and to check each room for intruders.  Therefore, the district court did not err when it denied Phelps's motion to suppress evidence.

## G.

The final issue Phelps raises on appeal is that the District Court erred when it admitted testimony regarding: (1) Phelps's possession and use of a nine-millimeter pistol shortly before the shooting; (2) Leaf's initial stop of Phelps; (3) Phelps's traveling to Ben Gonzales's house and giving Delma Bruguier his nine-millimeter pistol; and, (4) Phelps's arrest. Phelps argues that evidence of these "bad acts" should have been excluded because the government did not give proper notice under Federal Rule of Evidence 404(b). Phelps also argues that even if Rule 404(b) does not apply, the District Court failed to conduct the required Rule 403 analysis.

When making evidentiary rulings, the District Court has broad discretion, and its decisions will be overturned on appeal only when there has been an abuse of discretion. United States v. Jorgensen, 144 F.3d 550, 562 (8th Cir. 1998). In this case, the district court did not abuse its discretion when it admitted evidence relating to Phelps's actions immediately before and after the shooting. "'[B]ad acts that form the factual setting of the crime in issue' or that 'form an integral part of the crime charged'" are not part of Rule 404(b)'s coverage. United States v. Heidebur, 122 F.3d 577, 579 (8th Cir. 1997) (quoting United States v. Williams, 95 F.3d 723, 731 (8th Cir. 1996), cert. denied, 117 S. Ct. 750 (1997)). We have held:

> [W]here evidence of other crimes is "so blended or connected, with the one[s] on trial as that proof of one incidentally involves the other[s]; or explains the circumstances; or tends logically to prove any element of the crime charged," it is admissible as an integral part of the immediate context of the crime charged. When the other crimes evidence is so integrated, it is not extrinsic and therefore not governed by Rule 404(b).

United States v. Swinton, 75 F.3d 374, 378 (8th Cir. 1996) (citations omitted). In this case, all of the evidence challenged by Phelps concerns either events immediately before and after the discharge of the shotgun or events surrounding Phelps's arrest. None of the challenged acts concerns remote or unrelated events, and the evidence is blended and connected to the charged crimes. Therefore, Rule 404(b) does not apply.

Phelps correctly asserts that even if Rule 404(b) does not apply, "[t]he dictates of Rule 403 must still be applied to ensure that the probative value of this evidence is not outweighed by its prejudicial value." United States v. Bass, 794 F.2d 1305, 1312 (8th Cir.), cert. denied, 479 U.S. 869 (1986). We reverse a district court's ruling under the Rule 403 balancing test only if the court committed a clear abuse of discretion. United States v. Davis, 154 F.3d 772, 780 (8th Cir. 1998). In this case, Phelps does not provide any evidence that the District Court failed to consider the dictates of Rule 403. The evidence admitted was not unfairly prejudicial to Phelps's case and it had significant probative value. Evidence that Phelps brandished a nine-millimeter pistol just moments before firing a shotgun at Keeler is probative of his threatening behavior, and evidence of his behavior at the time of his arrest is probative of his hostility toward Keeler and the officers. The District Court did not clearly abuse its discretion under Rule 403 when it admitted evidence relating to Phelps's actions immediately before and after the shooting.

## III.

Phelps's convictions are affirmed.

BRIGHT, Circuit Judge, Dissenting.

The majority of our panel concludes that the district court properly refused to give jury instructions regarding intoxication as a defense to the specific intent element of the crime charged. The court justifies this conclusion by suggesting that the evidence would not support a finding that Mr. Phelps was intoxicated. I disagree. Substantial proof exists on the record to indicate that such an instruction was warranted, and, because I would remand on this issue alone, I dissent.

Although it is true that an instruction should not be given "if it lacks evidentiary support or is based on mere speculation", United States v. Lavallie, 666 F.2d 1217, 1219 (8th Cir. 1981), this court also applies the well-established principle of United States v. Fay, 668 F.2d 375 (8th Cir. 1981), that when a criminal defendant

makes a timely request for a jury instruction on a theory of defense, he is entitled to receive that instruction if it "'"is supported by evidence"'" and "'"sets out a correct declaration of law."'" Id. at 377 (quoting United States v. Manning, 618 F.2d 45, 47-48 (8th Cir. 1980)).

In Fay, the defendant was charged with assault with a dangerous weapon and the district court refused to give an instruction to the jury concerning intoxication as a theory of defense. On appeal, we reversed, citing evidence that: the defendant purchased beer and other liquor on several occasions in the hours leading up to the events for which he was convicted; he had been drinking for as much as 24 hours preceding the outbreak of violence at the victim's house; and the defendant was "passed out" shortly before the crime. See Fay, 668 F.2d at 377-78. On these facts, we held that the evidence would "support" a finding that he was intoxicated and therefore lacked the specific intent necessary for conviction.

In contrast, in Hayes v. Lockhart, 852 F.2d 339 (8th Cir. 1988), we determined that no instruction on intoxication was required because, on the facts of that case, there was minimal evidence that the defendant was impaired at the time of the crime. We did so based on evidence that: while the defendant testified that he had been drinking all day, both of his parents testified that he did not appear to be intoxicated and that they detected no odor of alcohol on his breath; the defendant's cousin testified that he did not appear to be intoxicated in the hours before the crime; and the officers that questioned the defendant all testified that they neither smelled alcohol on his breath, nor observed him to stagger or slur his words. See Id. at 345.

These cases, and others, indicate the obvious: intoxication instructions are fact specific. This court has required instructions to be given when the record reflects something more than minimal evidence of intoxication. At the very least, where the issue is controverted, where substantial evidence of drunkenness is present but yet must be balanced against some limited evidence to the contrary, such an issue is properly for the jury.

The record discloses the following proceedings and evidence. At the outset, the government began its case by arguing to the court that Mr. Phelps was intoxicated immediately after the alleged assault, noting that Phelps "was clearly under the influence of alcohol." (Tr. at 11). As for the testimony of witnesses, both the victim, Ms. Keeler, and others who encountered Mr. Phelps testified either to their subjective belief that Phelps had been drinking or to objective indicia that would suggest intoxication. Ms. Keeler testified that she thought Phelps had been drinking prior to the assault. (Tr. at 37). One of Keeler's children -- the only other witnesses to the actual events charged -- testified that, even as an seven-year old, he knew Phelps had been drinking. (Tr. at 93).

Delma Bruguier, Phelps' friend, saw him shortly after the incident. She testified that she thought he had been drinking. (Tr. at 125). Phelps was carrying a partially consumed 12-pack of beer and a bottle of whiskey that was as much as half finished. (Tr. at 124). Ms. Bruguier also testified that when Phelps arrived at her house he had an open bottle of beer, bloodshot eyes, and was behaving in a forward and aggressive manner. (Tr. at 124-28).

Officer Leaf, the responding and arresting officer, testified that Phelps had been "out all night drinking" prior to the assault and returned home mad. (Tr. at 243-44). According to officer Leaf, Phelps was "belligerent and cussed" when accosted immediately after the incident, and, in a bizarre sequence, when requested by officers to put his hands up, Phelps instead dropped his pants. (Tr. at 261-62).

Counterbalanced against this evidence, is the testimony of a single witness, Ms. Gregor. Ms. Gregor -- Ms. Keeler's mother -- testified that when she saw Phelps briefly immediately before the incident, he was calm and it did not occur to her that he might have been drinking. (Tr. at 516).

The majority correctly points out that no witness testified directly that Phelps either staggered or slurred his words --- implicitly suggesting that those signs are the

true touchstones of drunkenness. Such markers are not conclusive however, and the absence of such symptoms ought not be adopted as a quick test for sobriety. Rather, I suggest that we must consider the totality of the circumstances because such a reckoning proves to be a more reliable guide.

In short, there was significant evidence presented to the jury from which it might determine that Phelps was intoxicated at the time of the incident. While the evidence of intoxication may not be overwhelming, such a weight of proof has never been required by the law of this circuit. Instead, the Fay standard requires a jury instruction on a theory of defense if the request for instruction is merely "supported by evidence and if it sets out a correct declaration of law." Fay, 668 F.2d at 377 (emphasis added). In my view, Phelps presented ample evidence to support intoxication as a theory of defense. That intoxication may defeat specific intent is an indisputably correct declaration of law. See, e.g., Lavallie, 666 F.2d at 1219.

The defendant presented sufficient evidence for the court to instruct on this issue. Thus, the district court's refusal to so instruct constitutes prejudicial error in my view, and on that basis I would remand the case to the district court for a new trial.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.