# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2262
_____

United States of America

*Plaintiff - Appellee*

v.

Xavier Zephier

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: June 19, 2020
Filed: February 25, 2021

_____

Before KELLY, ERICKSON, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

Following a jury trial, the district court convicted Xavier Zephier of aggravated sexual abuse. *See* 18 U.S.C. §§ 1153, 2241(a)(1), 2246(2)(A). His main argument on appeal is that, through two evidentiary rulings, the court deprived him of his ability to present a complete defense. We agree, so we reverse his conviction and remand for a new trial.

I.

During a night of partying at Zephier's home on the Yankton Sioux Reservation in South Dakota, two guests, O.A. and A.Z., had consensual sex in his basement. The next morning, after they returned from an appointment, O.A. and A.Z. fell asleep together on Zephier's couch. O.A. left about an hour later, after which A.Z. fell back to sleep.

What happened next is heavily disputed. According to A.Z., she awoke on her stomach to someone pulling down her pants. The person behind her, who she thought was O.A., began having sex with her. No one answered when she said "wait . . . [s]top," but she soon felt "pressure" on her back. When she finally freed herself and turned around, she was shocked to see Zephier's face. At that point, she decided to get dressed and leave. But on the way out, she told others what he had done. Later that day, she reported the crime to the police, who arrested him.

Zephier's account differed. During a jailhouse interview with an FBI agent and a tribal investigator, he claimed that all he did was try to wake up A.Z., who then suddenly grabbed and started kissing him. From there, one thing led to another, and he claims that they had consensual sex. During the course of the interview, Zephier let it slip that he had been accused of rape before.

A grand jury charged him with one count of aggravated sexual abuse occurring in Indian country. *See* 18 U.S.C. §§ 1153, 2241(a)(1), 2246(2)(A). As relevant here, Zephier unsuccessfully attempted to suppress his jailhouse statements, exclude expert testimony, and admit evidence that A.Z. had been sexually assaulted before. Following trial, a jury found him guilty, and the district court sentenced him to 180 months in prison.

## II.

We start with the jailhouse statements. In evaluating whether they should have been suppressed, we review the district court's legal conclusions de novo and its factual findings for clear error.[1] *See United States v. Jackson*, 852 F.3d 764, 769 (8th Cir. 2017).

## A.

Before making the approximately two-hour drive to interview Zephier, FBI Special Agent Robert Mertz obtained a search warrant authorizing him to swab Zephier's inner cheek for a DNA sample. At the jail, he was joined by Yankton Sioux Tribe Criminal Investigator Leander Saunsoci. Mertz provided *Miranda* warnings to Zephier, who then signed a form confirming that he had been advised of his rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

After first saying that he would like to provide a written statement, Zephier changed his mind and told the officers he would rather speak to them. Agent Mertz then told him, "[o]kay, whatever's good for you. . . . It's completely voluntary but obviously there's two sides to every story, and that's why I am not dragging you out of here right now. I want to get your side of this story[.]"

When the officers told Zephier that they were ready for him to begin, he started to hesitate, wondering out loud "if [he] want[ed] a lawyer or if it'd be better just to do a statement." They replied that it was "totally [his] decision." He then asked whether he could call his father for advice, but after checking with jail staff, Investigator Saunsoci informed him that he could not make a call until after his arraignment.

---

[1]Although we ultimately reverse Zephier's conviction, we can still review the district court's pretrial ruling denying his motion to suppress. *See United States v. Bordeaux*, 400 F.3d 548, 559–62 (8th Cir. 2005).

Eventually, after being reminded that it was solely his decision whether to make a statement, Zephier said, "alright I want to do a statement, but I'd rather, rather just wait 'til I see a lawyer, if anything." Investigator Saunsoci replied that all was "well and good" and suggested that they could arrange another meeting once Zephier had an attorney. At that point, the following exchange took place:

Mertz: We've got one more order of business here. This is your copy. But I have a search warrant for ya. So, what it is, is, just basically two q-tips taking uh swabs of your cheeks.

Zephier: Oh, okay.

Mertz: Okay, so. This, unfortunately, this is not optional. I have to do it, I have a warrant, so . . . .

Zephier: Alright, well, I'll, I'll do a statement, then.

Mertz: Well, no I don't want this to influence you giving a statement, so, if if you want to give the statement, that's fine . . . .

Zephier: I mean, yeah I'd rather, I'd rather just do the statement now.

. . .

Mertz: Well, one way or the . . . I need to execute this because I'm ordered to by law, so do you want to do [the swabs] now, or do you want to give me a statement first?

Zephier: I'll do the statement first . . . .

Zephier then told the officers what had happened with A.Z., mentioning along the way that he had previously been accused of rape.

B.

Prior to trial, Zephier asked the district court to suppress his entire statement. His position was that, once he unambiguously invoked his right to counsel, the officers should have completely ended the interview. *See Davis v. United States*, 512 U.S. 452, 461 (1994) (holding that "law enforcement officers may continue questioning until and unless the suspect *clearly requests* an attorney" (emphasis added)). Both the magistrate judge and the district court decided that there was no reason to suppress his statement because, after he asked for counsel, the officers stopped interrogating him.

The general rule is that, if a suspect who is in custody unambiguously invokes the right to counsel, law enforcement must end all questioning until an attorney is present or the suspect reinitiates the discussion. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *United States v. Havlik*, 710 F.3d 818, 821 (8th Cir. 2013). On appeal, the government concedes that Zephier was in custody and that he unambiguously invoked his right to counsel. So all we have to decide is whether Agent Mertz's statement that he intended to take a buccal swab amounted to interrogation.

As the Supreme Court has explained, interrogation encompasses both "express questioning" and "its functional equivalent," including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). Even if a suspect invokes the right to counsel, however, officers may continue to make "limited and focused inquiries . . . attendant to [a] legitimate police procedure" if they are "not likely to be perceived as calling for any incriminating response." *Pennsylvania v. Muniz*, 496 U.S. 582, 605 (1990) (internal quotation marks omitted).

Agent Mertz's statement fell into this category. He simply presented the search warrant to Zephier and told him what it allowed him to do. It was, in other

-5-

words, "a statement of fact" about a legitimate police procedure. *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005). We have previously held that telling a suspect about a planned search of his sister's house did not amount to interrogation, even though he had stored evidence there. *See id.* at 766–67. If anything, our conclusion in *Hull* applies with even greater force here, because the procedure required Zephier's cooperation and was to be carried out within seconds, whereas the officer in *Hull* was merely providing "a statement of fact" about "the [direction] of the investigation." *Id.* at 767; *see also Muniz*, 496 U.S. at 604–05 (holding that an officer did not interrogate a suspect by asking him to take a breathalyzer test and explaining the legal consequences of refusing).

Yet Zephier suggests that *Hull* is not on point because the search warrant in this case authorized an immediate search of *his body*, not someone else's property. *See Hull*, 419 F.3d at 767. This is a distinction without a difference. The police procedure here is no less "legitimate" because it involved a different type of search than in *Hull*, *Muniz*, 496 U.S. at 605, and Agent Mertz would not have known that his statement was reasonably likely to elicit any response, much less an incriminating one, *see Innis*, 446 U.S. at 301; *see also, e.g.*, *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) (explaining that a response to a question about a search was not likely to have "induce[d] an incriminating admission"); *State v. Juntilla*, 711 S.E.2d 562, 569 (W. Va. 2011) (per curiam) (holding that an officer did not interrogate a suspect by taking a DNA sample "pursuant to a court order").

There is also no reason to believe that the statement was a "psychological ploy[]" to get Zephier to talk. *Arizona v. Mauro*, 481 U.S. 520, 529 (1987). On the contrary, as the magistrate judge found, the officers ceased all questioning after Zephier invoked his right to counsel and "took great pains to explain" that "the search warrant had nothing to do with [his] decision [about] whether to make a statement." The "possibility" that Zephier would respond by incriminating himself did not transform their words and actions into interrogation. *Id.* at 528 (quotation marks omitted); *see also id.* at 529 (explaining that "hoping" that a suspect would "incriminate himself" is not enough).

-6-

## III.

We now turn to Zephier's main argument, which is that two evidentiary rulings deprived him of a meaningful opportunity to present a complete defense. The first ruling let evidence in: expert testimony about the typical behaviors of sexual-assault victims. The second kept evidence out: testimony about whether A.Z. had been sexually assaulted before. In isolation, neither posed a problem. But together, they stood in the way of mounting a complete defense.

## A.

Zephier's position throughout trial was that he had consensual sex with A.Z., which is also what he told Agent Mertz and Investigator Saunsoci during the jailhouse interview. A.Z. testified, by contrast, that Zephier forcibly raped her, which made her credibility a central focus at trial, particularly in light of the minimal physical evidence of trauma. To assist the jury in evaluating her testimony, the government called an expert witness.

The expert was Krista Heeren-Graber, the Executive Director of the South Dakota Network Against Family Violence and Sexual Assault. According to the notice provided by the government, she would cover "the effects experienced by victims of sexual assault." The district court, relying on our precedent, denied Zephier's pretrial motion to exclude her testimony. *See, e.g.*, *United States v. Johnson*, 860 F.3d 1133, 1139–41 (8th Cir. 2017) (upholding a district court's decision to admit Heeren-Graber's testimony in another case).

At trial, Heeren-Graber explained that sexual-assault victims often "delay[] reporting," "minimiz[e] what's occurred," and "chang[e] the[ir] stor[ies]." They may also turn to harmful coping mechanisms like drug and alcohol use, "cutting behavior," and "promiscuity." Mental and emotional health can suffer in other ways too, with many victims experiencing "anxiety and depression," "difficulty sleeping,"

and strained relationships. Critically, she said that, depending on the individual, these harmful effects can last "for a long period of time."

A.Z. experienced some of these difficulties. She started using "meth again," feeling uncomfortable around her brother, and cutting herself. Zephier's other two alleged victims, A.N. and M.W.T., also reacted in similar ways. *See* Fed. R. Evid. 413(a) (authorizing the admission of evidence that a *criminal defendant* "accused of a sexual assault" had "committed any other sexual assault"). In closing arguments, the government connected the dots, pointing out that the three women experienced what Heeren-Graber had described.

Anticipating the government's strategy, Zephier asked to counter her testimony by introducing evidence that A.Z. had been sexually assaulted "several years" earlier by someone else. If the district court decided to allow the government to bolster A.Z.'s credibility with expert testimony, then he believed that the jury at least had to be presented with an alternative explanation for her behavior. The district court disagreed and ruled that Zephier could not broach the subject during trial. *See* Fed. R. Evid. 412(a)(1) (making "evidence offered to prove that a *victim* engaged in other sexual behavior" generally inadmissible (emphasis added)). *But see id.* 412(b)(1)(C) (providing an exception for "evidence whose exclusion would violate the defendant's constitutional rights").

B.

For two reasons, Zephier believes that these rulings deprived him of a fair trial. *See Lannert v. Jones*, 321 F.3d 747, 753 (8th Cir. 2003). First, in his view, the expert testimony was never admissible in the first place. Second, even if it was, the district court went too far by cutting off his ability to counter it. Although we typically review evidentiary rulings for an abuse of discretion, *see United States v. Street*, 531 F.3d 703, 708 (8th Cir. 2008), de-novo review applies when a constitutional right is at stake, *see United States v. White*, 557 F.3d 855, 857 (8th Cir. 2009).

1.

Zephier's first argument runs into a wall of precedent. For almost 30 years, we have allowed this type of expert testimony. *See, e.g.*, *Johnson*, 860 F.3d at 1138, 1140–41 (upholding a decision to admit testimony about "a scientific study highlighting the power and control that propels abusive domestic relationships"); *United States v. Kirkie*, 261 F.3d 761, 766 (8th Cir. 2001) (affirming a decision to allow testimony about the "characteristics of sexually abused children in general"); *United States v. Johns*, 15 F.3d 740, 743 (8th Cir. 1994) (allowing an expert to "describe[] emotional and psychological traits" of abused children as long as she did "not state an opinion that sexual abuse has in fact occurred"). The reason is that some post-abuse behavior, like delayed reporting and shifting stories, may seem counterintuitive, so expert testimony will allow jurors to "evaluate the alleged victim's behavior" and "assess . . . credibility" by understanding "how individuals generally react to sexual abuse." *Johnson*, 860 F.3d at 1140–41; *accord State v. Obeta*, 796 N.W.2d 282, 293 (Minn. 2011) (concluding that "the mental and physical reactions of an adult sexual-assault victim may lie outside the common understanding of an average juror").

In Zephier's view, however, this case is different because all Heeren-Graber did was improperly vouch for A.Z., A.N., and M.W.T. To be sure, some of what she said came close to the line, such as when she told the jury that the trauma can be worse for victims if "people [do not] believe" them or they do not get a just result after "cooperat[ing] with the criminal justice system." *See United States v. Wipf*, 397 F.3d 632, 636 (8th Cir. 2005) ("[E]vidence is unfairly prejudicial when it would influence the jury to decide the case on an improper basis." (quotation marks omitted)). But given that she never tried to "diagnos[e] [them as] victim[s] [of] sexual abuse" or opine about whether they were telling the truth, *Johnson*, 860 F.3d

at 1140–41, we cannot say that the district court abused its discretion in admitting her testimony.[2]

2.

The calculus changed once the district court cut off Zephier's ability to present an alternative explanation for A.Z.'s drug use and other difficulties. In our adversarial system, criminal defendants have long had a right "to introduce evidence in their defense." *United States v. Pumpkin Seed*, 572 F.3d 552, 559–60 (8th Cir. 2009) (rooting this right in the Fifth and Sixth Amendments); *see Faretta v. California*, 422 U.S. 806, 818 (1975) ("In short, the [Sixth] Amendment constitutionalizes the right in an adversary criminal trial to make a defense as we know it."). To be sure, the right is not absolute and must "bow to accommodate other legitimate interests in the criminal trial process," such as "ensuring that only reliable evidence is introduced at trial." *United States v. Scheffer*, 523 U.S. 303, 308–09 (1998) (quotation marks omitted). But any restrictions cannot be "arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 308 (internal quotation marks omitted).

As we have recognized, limiting evidence of a victim's "other sexual behavior" serves a number of legitimate interests, Fed. R. Evid. 412(a)(1), including preventing "harassment and embarrassment," thwarting "an unwarranted intrusion into" a victim's "private life," and warding off "a thinly[]veiled [credibility] attack," *Pumpkin Seed*, 572 F.3d at 560 (internal quotation marks omitted). So in a vacuum, excluding evidence of A.Z.'s alleged prior sexual assault was not arbitrary. *See United States v. Never Misses A Shot*, 781 F.3d 1017, 1029 (8th Cir. 2015); *United States v. Elbert*, 561 F.3d 771, 776 (8th Cir. 2009); *Bordeaux*, 400 F.3d at 558–59.

---

[2]Zephier no longer argues that Heeren-Graber's testimony was inadmissible because it did not "help the trier of fact." Fed. R. Evid. 702(a).

Total exclusion became problematic, however, once Heeren-Graber's testimony was added to the mix. There is little question that it bolstered A.Z.'s credibility by showing that her reaction to the alleged crime was consistent with how rape victims often respond. But then, by ruling that it was off-limits for Zephier to question her about a prior sexual assault, the district court left him unable to effectively counter it. He could not argue to the jury, for example, that the difficulties she experienced were the result of a prior crime, not the one he allegedly committed. Even if each of the district court's evidentiary rulings was fine on its own, together they deprived him of his ability to present a complete defense. In constitutional parlance, they were "disproportionate" to the "legitimate interests" they were "designed to serve." *Scheffer*, 523 U.S. at 308–09 (quotation marks omitted); *see also* Fed. R. Evid. 412(b)(1)(C) (recognizing that the exclusion of other-sexual-behavior evidence cannot "violate the defendant's constitutional rights").

We held as much in *United States v. Bear Stops*. 997 F.2d 451 (8th Cir. 1993). During a trial of an individual accused of molesting two children, expert witnesses testified about how child-sex-abuse victims typically respond afterward. *Id.* at 453–54. When the defendant tried to present "an alternative explanation for" the behavior of one of the boys he had allegedly molested—by showing that he had been sexually abused by others during the same approximate time period—the district court "rigorously limited the admission of the evidence." *Id.* at 454–55. On appeal, we held that, once the district court took away his ability to explore "the basic factual details" of the other abuse, "the jury may have been led directly to the conclusion that [the defendant] was the perpetrator of the sexual abuse." *Id.* at 454–55, 457. The restrictions, in other words, "were 'disproportionate to the purposes they [we]re designed to serve.'" *Id.* at 455 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

We reach the same conclusion here. By keeping Zephier from exploring even "the basic factual details" of A.Z.'s prior sexual assault, the jury could "have been led . . . to the conclusion" that her difficulties were caused by Zephier's alleged criminal conduct, and his alone. *Id.* at 455, 457.

Not so, says the government, because of one important difference between this case and *Bear Stops*: the abuse there occurred during the same general time period as the charged criminal acts, whereas the prior sexual assault in this case happened "several years" earlier. *See id.* at 454; *see also United States v. Hawkghost*, 903 F.3d 774, 778 (8th Cir. 2018) (distinguishing *Bear Stops* in part based on timing). We are unpersuaded for at least two reasons.

First, the record is less than clear on the timing of the prior sexual assault. The statement that it happened "several years ago" was from an FBI interview with A.Z.'s mother in February 2019, nearly a year and a half after Zephier allegedly raped A.Z. So the exact timing of the prior assault is unclear, and without knowing more, we cannot be sure how close together the two were.

Second, Heeren-Graber testified that the effects of sexual-abuse trauma can "continue for a long period of time." This statement, in particular, meant that A.Z.'s prior assault was still relevant *rebuttal* evidence, even if it happened "several years" before. *See United States v. Jean-Guerrier*, 666 F.3d 1087, 1092 ("Rebuttal evidence is offered to explain, repel, counteract, or disprove evidence of the adverse party. . . . Like all evidence, [it] must be relevant to be admissible." (internal quotation marks omitted)). Although Heeren-Graber did not specify how long the effects could last, her testimony implied that other traumatic events in A.Z.'s past could account for her behavior.[3] The upshot is that if the jury had heard that A.Z. had been sexually assaulted before, even "several years" earlier, it may well have concluded that the earlier sexual assault, rather than what Zephier allegedly did, accounted for the "behavioral manifestations" of her trauma. *Bear Stops*, 997 F.2d

---

[3]None of the other cases in which we have upheld the exclusion of a victim's prior sexual assault involved expert testimony of this type, much less an opinion that the effects from it can last a long time. *See Hawkghost*, 903 F.3d at 778; *Never Misses A Shot*, 781 F.3d at 1028–29; *cf. Pumpkin Seed*, 572 F.3d at 559–60 (involving prior, consensual sexual activity).

-12-

at 457. For that reason, Zephier had the right to present "an alternative explanation for the prosecution's persuasive [expert] evidence."[4] *Id.*

## C.

These evidentiary rulings, taken together, were not "harmless beyond a reasonable doubt." *United States v. Herbst*, 668 F.3d 580, 585 (8th Cir. 2012) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)) (applying this standard in a case involving the right to present a complete defense). The government's main argument to the contrary is that Zephier's counsel had an opportunity to cross-examine A.Z. about *other* potential sources of trauma in her life. Among the topics discussed were her abusive relationship, her struggles with alcohol and drugs, and her difficult childhood. But to believe that these other factors explained her troubles, the jury would have needed to discount the possibility that an alleged sexual assault was the cause. Had Zephier been able to present evidence that she had been assaulted before, however, the jury could have concluded, consistent with Heeren-Graber's testimony, that the earlier sexual assault was the source of her trauma.

The government also points to the strength of the other evidence, including testimony from several witnesses about what A.Z. said shortly after the alleged attack. *See United States v. Santos*, 235 F.3d 1105, 1108 (8th Cir. 2000) (examining whether the other evidence was overwhelming). Two other women also testified that Zephier had tried to sexually assault them, and in at least one case, that he had actually succeeded. It is possible—perhaps even likely—that hearing about A.Z.'s prior sexual assault would not have changed the jury's mind. But we must be able to say that it is "*clear beyond a reasonable doubt* that a rational jury would have

---

[4]We do not suggest that Zephier was entitled to explore every detail of the prior sexual assault. Rather, the district court had the discretion to place reasonable restrictions on the presentation of evidence about it. *See Bear Stops*, 997 F.2d at 455, 457 (discussing the options, but making clear that it could not be "so sanitized that it [would be] insufficient to support the purpose for which it was offered").

found [Zephier] guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999) (emphasis added).

We cannot say that here. There was conflicting testimony on consent and little *physical* evidence of trauma. So A.Z.'s credibility became a central focus at trial; the expert testimony was a key ingredient in evaluating it; and the other evidence of guilt, while strong, was not overwhelming. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (listing factors courts should consider in assessing whether an error is harmless beyond a reasonable doubt); *cf. United States v. Eagle*, 498 F.3d 885, 889 (8th Cir. 2007) (holding that any violation of the defendant's right to present a complete defense was harmless because "the evidence of [his] guilt was strong and the probative weight of the excluded evidence was relatively weak"). The bottom line is that we end up in the same place as in *Bear Stops*: Zephier is entitled to a new trial.[5] *See* 997 F.2d at 458.

IV.

We accordingly reverse the judgment of the district court and remand for a new trial.

———————————————

[5]Given our conclusion to remand for a new trial, we need not address Zephier's argument that the district court abused its discretion when it instructed the jury that it could consider his "silence in the face of accusation" as an admission of guilt. *See* Eighth Cir. Model Crim. Jury Instr. § 4.14 (2017); *see also Qualley v. Clo-Tex Int'l, Inc.*, 212 F.3d 1123, 1132 n.18 (8th Cir. 2000) ("In light of our decision to remand the case, we decline to address whether a jury instruction on the doctrine of in pari delicto should be given in the new trial—that determination must be made in light of all of the admissible evidence submitted to the district court on retrial.").