# United States Court of Appeals
### For the Eighth Circuit

_____

No. 22-1676
_____

United States of America

*Plaintiff - Appellee*

v.

Darrius Decnan Redd

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa
_____

Submitted: June 15, 2023
Filed: September 5, 2023
_____

Before GRUENDER, KELLY, and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

A jury convicted Darrius Redd of sex trafficking, facilitating prostitution, and distributing a controlled substance to a person under twenty-one years old. On appeal, Redd argues he is entitled to a new trial on two of the three counts because

the district court[1] made evidentiary errors and the government deprived him of a fair trial.  We affirm.

## I.  Background

A jury found Redd guilty of sex trafficking by force, fraud, or coercion, 18 U.S.C. § 1591(a)(1) and (b)(1); facilitating prostitution, 18 U.S.C. § 1952(a)(3)(A); and distributing methylenedioxymethamphetamine ("MDMA") to a person under twenty-one, 21 U.S.C. §§ 841(a)(1) and 859.  Most relevant for this appeal, the government relied on evidence related to the trafficking of A.E. who, at the time, was a college student and under twenty-one.  According to the indictment, Redd trafficked A.E. between approximately February 2 and March 14, 2020.

A.E. testified at trial and recounted the following.  On or about February 2, sometime after midnight, A.E. met Redd at a gas station in Iowa.  A.E. gave Redd her phone number and social media information, and Redd gave A.E. the drug commonly known as "molly."[2]  A.E. believed Redd's name was "Shawn Cory" because of his social media profile.

A month later, in the early morning on March 3, Redd visited A.E.'s sorority house after insisting he "needed to meet up with" her and that "it wouldn't take that long."  Shortly after he arrived, Redd suggested A.E. use the molly he brought with him. A.E. eventually agreed.  The drug made her feel "very relaxed" and "talkative." Using a cell phone, Redd openly recorded A.E. while asking her personal questions, including about her family and sexual history.  The encounter turned sexual, and Redd recorded A.E. and himself having sex.

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

[2]A certain type of MDMA is commonly referred to as molly.

At some point on March 3, Redd proposed to A.E. that she could make money as a prostitute, but first she had to pay back a "debt" she owed Redd for helping her prostitute. Before A.E. began working with Redd, he warned her that she did not "want to know the consequences" if she had sex with anyone "he didn't approve of," meaning she could only have sex with people who were giving her money in exchange. While Redd told A.E. he made money "off of other girls that were having sex for him," he also told her that he sold or abused the women who worked for him if they did not "do what he wanted them to."

Later that same day, Redd scheduled appointments for A.E. to prostitute herself. After driving A.E. to meet with two clients, Redd took the money she received. By this point, Redd made A.E. share her location with him via a social media application. A.E. was eager to "help" Redd by, for example, texting him about her new "goals" to earn more money in part because she was afraid Redd could retaliate against her by releasing the videos from the sorority house.

Redd continued to drive her to and from prostitution encounters, and he collected all of the money. On March 7, Redd forced her to have sex with him. And on March 8, A.E. "kind of protest[ed]" Redd's sexual advances, but he told her she was going to have sex with him anyway. Later that evening, Redd had a contentious encounter with one of A.E.'s clients, which led to police officers asking A.E. some questions. When Redd found out that A.E. spoke with the police, he became "very aggressive" and told her via text message that she was "going to regret this." Redd had A.E.'s wallet, as well as videos and pictures of her, so A.E. "tried to reassure him" that she had not told the police anything. Redd agreed to eventually return her wallet.

When Redd visited A.E. at her sorority house on March 12, he did not bring her wallet. While Redd told A.E. he wanted to talk, he instead drove A.E. to a hotel, gave her drugs and alcohol that she consumed, and told her that she "was going to make money." While A.E. "was on a lot of molly," she and Redd had a sexual encounter. The encounter devolved into Redd holding A.E.'s arms down and

-3-

urinating in her mouth. On March 13 and 14, A.E. engaged in prostitution with more clients. And on March 14, Redd drove A.E. back to her sorority house so that her mother could pick her up for spring break.

Redd continued to contact A.E. through text messages. He texted A.E. that he had "voicemails of [her] admitting to prostituting" and that she had "told [him] everything about everything." Redd also texted her, "[w]hen you least expect so always expect," and "[y]ou can get touched right now this moment hoe." Redd's texts became more explicit, claiming A.E. owed him $30,000 and that he "recorded everything," including her sexual interactions with him and others. He wrote, "Cash app. Clear your debt. Or . . . ." (ellipsis in original).

Redd testified at trial in his defense. Redd acknowledged he had sex with A.E. on multiple occasions, agreed to set up an online escort account for A.E., and drove A.E. around to meet with clients. But he insisted A.E. voluntarily participated in all of this. Redd also testified he did not keep all of the money A.E. earned and never gave her a controlled substance. Redd told the jury that, between March 3 and 14, he never suggested to A.E. that he would use the videos of their sexual interactions to embarrass or extort her.

Despite Redd's testimony, the jury found him guilty of sex trafficking by force, fraud, or coercion; facilitating prostitution; and distributing MDMA to a person under twenty-one years old. The district court sentenced Redd to forty-five years in prison.

## II. Analysis

Redd asks us to reverse and remand for a new trial on two of the three counts: sex trafficking and distributing MDMA. In support, Redd argues the district court erred by excluding videos of his initial sexual encounter with A.E. and by admitting expert testimony. He also argues the government deprived him of a fair trial when it cross-examined him and during its closing argument.

## A. Exclusion of Evidence

Before trial, Redd sought to admit videos of his and A.E.'s initial sexual encounter at the sorority house to undermine the government's theory that he used force, fraud, or coercion to cause A.E. to engage in a commercial sex act. The district court excluded the videos in their entirety under Rules 401, 402, 403, and 412 of the Federal Rules of Evidence. On appeal, Redd challenges the district court's ruling under the Federal Rules of Evidence and the Constitution. We review evidentiary rulings for abuse of discretion. *United States v. Schave*, 55 F.4th 671, 677 (8th Cir. 2022). Our review, however, is de novo when an evidentiary ruling implicates a constitutional right. *United States v. Walker*, 917 F.3d 1004, 1008 (8th Cir. 2019).

We begin with Redd's arguments grounded in the Federal Rules of Evidence. Broadly, he argues the district court erred because the videos—in their entirety— were necessary to show A.E. and Redd had a consensual sexual relationship, A.E.'s sexual preferences, and A.E.'s consent to prostitute herself. First, Redd challenges the application of Rule 412 to exclude the videos, claiming the videos fall under the limited exception for evidence of a victim's sexual behavior. He also characterizes the videos as "intrinsic," arguing admission of the evidence would have allowed the jury to reject A.E.'s "testimony that she did not consent to Redd's allegedly forceful conduct in later sexual encounters."

Under Rule 412, "[t]he following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct: (1) evidence offered to prove that a victim engaged in other sexual behavior; or (2) evidence offered to prove a victim's sexual predisposition." Fed. R. Evid. 412(a). In a criminal case, however, a "court may admit . . . evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent[.]" Fed. R. Evid. 412(b)(1)(B). Here, Redd was charged with using force, fraud, or coercion to cause A.E. to engage in a commercial sex act. In this way, a video that displays a victim's initial sexual encounter with a defendant does not prove the victim's consent to later exchange money for sex with someone

else.[3]  *Cf. United States v. Roy*, 781 F.3d 416, 420 (8th Cir. 2015) ("At issue here is not recruiting an individual to engage in commercial sex for the first time, but doing an act with the use of force, threats, fraud, or coercion to cause the victim to engage in commercial sex.").

Even if the videos were admissible under Rule 412, we see no reason to disturb the district court's exclusion under Rule 403.  *See United States v. Pumpkin Seed*, 572 F.3d 552, 558–59 (8th Cir. 2009).  Under Rule 403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]"  Fed. R. Evid. 403.  "Unfair prejudice means an undue tendency to suggest decision on an improper basis, including evidence which is so inflammatory on its face as to divert the jury's attention from the material issues in the trial."  *Schave*, 55 F.4th at 678 (quoting *United States v. Richardson*, 40 F.4th 858, 867 (8th Cir. 2022)).  We afford great deference to a district court's balancing under Rule 403 "of the probative value and prejudicial impact of the evidence."  *Pumpkin Seed*, 572 F.3d at 558 (quoting *United States v. Ruiz*, 412 F.3d 871, 881 (8th Cir. 2005)).

In a pretrial order, the district court acknowledged that A.E.'s statements in the videos "about sexual activity with Redd may be admissible."  The district court ultimately concluded it could not "rule on the statements in the abstract without understanding the testimony and proposed use of the statements" and thus invited further argument and reserved "ruling on the statements" in those videos "until the matter presents itself at trial."  At trial, A.E. and Redd testified about much of what was depicted in the videos.  This lends support to the district court's decision that

---

[3]At oral argument, the government stated the indictment included the date March 3 because the encounter at the sorority house was the beginning of Redd and A.E.'s relationship.  The government then stated the March 3 encounter at the sorority house involved fraud and coercion.  We understand the government's theory to be that Redd generally began his scheme in the early morning on March 3—not that Redd used force, fraud, or coercion to cause A.E. to engage in prostitution at that time.

any probable value of showing the jury the videos would be substantially outweighed by a danger of unfair prejudice as inflammatory enough to divert the jury's attention from the material issue at trial—whether Redd *later* used force, fraud, *or* coercion to cause A.E. to exchange sex with others for money. *See* Fed. R. Evid. 403. In this way, Redd's argument is similar to the one we rejected in *Roy*, where we held the district court did not abuse its discretion in excluding a video depicting a sexual act because the trial testimony described the contents of the video, making "the explicit video . . . substantially more prejudicial than probative." 781 F.3d at 419.

Redd also argues the district court's evidentiary rulings violated the Fifth Amendment's Due Process Clause and the Sixth's Amendment's Confrontation Clause. "In our adversarial system, criminal defendants have long had a right 'to introduce evidence in their defense.'" *United States v. Zephier*, 989 F.3d 629, 636 (8th Cir. 2021) (quoting *Pumpkin Seed*, 572 F.3d at 559–60); *see also* U.S. Const. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law."); U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."). The right to introduce evidence in one's defense is limited by "legitimate interests in the criminal trial process" so long as those restrictions are not "arbitrary or disproportionate to the purposes they are designed to serve." *Zephier*, 989 F.3d at 636 (quoting *United States v. Scheffer*, 523 U.S. 303, 308–09 (1998)); *see also United States v. Elbert*, 561 F.3d 771, 777 (8th Cir. 2009) ("If evidence has only minimal probative value and would have a highly prejudicial effect, a court can exclude the evidence without infringing upon the Confrontation Clause or other constitutional rights of a defendant."). We will affirm a conviction despite a district court's limits on cross-examination "unless there has been a clear abuse of discretion and a showing of prejudice to the defendant." *United States v. Johnson*, 860 F.3d 1133, 1143–44 (8th Cir. 2017) (quoting *United States v. Petters*, 663 F.3d 375, 382 (8th Cir. 2011)).

At trial, the government's theory was that Redd used fraud and coercion, *as well* as force, to cause A.E. to engage in commercial sex acts. On appeal, Redd attacks the district court's pretrial ruling that he could not cross-examine A.E. on statements in the videos about her preference for "rough sex," arguing this prevented him from rebutting A.E.'s testimony that he forced her to have sex.

"A critical factor in determining whether a defendant's right of confrontation has been violated is whether the defendant had other ways to obtain the effect that the excluded examination would have allegedly established." *United States v. Brown*, 110 F.3d 605, 611 (8th Cir. 1997). Here, Redd never tried to cross-examine A.E. on, for example, what distinguished the initial sexual encounter with subsequent encounters that A.E. testified involved force. Perhaps this was a strategic decision on Redd's part to insulate the jury from details surrounding his alleged use of force. Regardless of Redd's motivation, he never cross-examined A.E. in a manner that warranted a departure from the district court's pretrial ruling. Again, the district court's pretrial order "reserve[d] ruling on the statements contained in the video until the matter present[ed] itself at trial." Under these circumstances, we cannot conclude the district court clearly abused its discretion.

Relatedly, Redd argues his constitutional rights were violated when the district court held he could not cross-examine A.E. regarding statements in the videos suggesting she previously engaged in prostitution. In support, Redd relies on *Zephier*. In *Zephier*, we concluded the district court erroneously prevented the defendant, who was charged with aggravated sexual abuse, from presenting "an alternative explanation" for the alleged victim's "drug use and other difficulties." 989 F.3d at 636. Specifically, the defendant was unable to argue "the difficulties [the alleged victim] experienced were the result of a prior crime, not the one he allegedly committed," after the expert testified regarding how rape victims often respond. *Id. Roy*, a case involving sex trafficking under 18 U.S.C. § 1591(a)(1), is more on point. 781 F.3d at 418. In *Roy*, we rejected the defendant's Sixth Amendment argument that the district court erred by excluding evidence of a victim's sexual history, reasoning "evidence of past prostitution ha[d] little

impeachment value because it [did] not contradict [the victim's] testimony about [the defendant]." *Id.* at 421. So too here. Because the "evidence has only minimal probative value and would have a highly prejudicial effect," the exclusion of the videos did not violate Redd's constitutional rights. *See id.* (quoting *Elbert*, 561 F.3d at 777).

## B. Expert Testimony

Redd next challenges the district court's admission of Carrie Landau's expert testimony on sex-trafficking-related topics. Redd first argues the district court abused its discretion because, under Rule 702, the expert testimony was broad and merely mirrored the facts of the case. Redd also insists Landau's expert testimony was unfairly prejudicial under Rule 403 because Landau, in effect, presented A.E.'s "innocuous characteristics as consistent with a sex trafficking victim[.]"

"The admission or exclusion of expert testimony is reviewed for abuse of discretion." *United States v. Merrell*, 842 F.3d 577, 582 (8th Cir. 2016). "Improperly admitted testimony warrants reversal of a conviction if the testimony 'substantially influenced the jury's verdict.'" *Id.* (quoting *United States v. Iron Hawk*, 612 F.3d 1031, 1039 (8th Cir. 2010)) (alteration omitted). Under Rule 702 of the Federal Rules of Evidence, a district court can admit expert testimony if, among other things, "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702(a). A district court may exclude evidence under Rule 403 even when Rule 702 is met. *United States v. Strong*, 826 F.3d 1109, 1115 (8th Cir. 2016). Under Rule 403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Fed. R. Evid. 403.

The district court did not abuse its discretion by admitting Landau's testimony. At the time of trial, Landau had been employed as an FBI agent for almost twenty years. As an agent and member of a sex trafficking task force, Landau has participated in over 130 sex trafficking investigations, which often included

interviews with victims and suspects. At trial, Landau testified about her specialized knowledge regarding sex trafficking, including terminology, characteristics of victims, and methods used by traffickers to recruit and retain women. Given the unique terminology and circumstances surrounding sex trafficking, Landau's specialized knowledge could help the jury understand the evidence. For example, we have concluded a district court did not abuse its discretion by admitting expert testimony from a special agent on a human trafficking task force who "testified from her training and experience on the operation of sex trafficking rings and the terms used therein." *United States v. Geddes*, 844 F.3d 983, 991 (8th Cir. 2017). Indeed, expert testimony about how individuals generally react to being trafficked can help a trier of fact evaluate an alleged victim's behavior. *See Johnson*, 860 F.3d at 1140 (applying similar reasoning to a case involving aggravated sexual abuse). Although Redd takes issue with Landau's testimony as "mirroring" A.E.'s testimony, we see her testimony as consistent with the purpose and scope of expert testimony: helping the trier of fact. *See* Fed. R. Evid. 702(a). And it does not mean Landau's testimony was unduly prejudicial. *See United States v. Washington*, 810 F. App'x 478, 480–81 (8th Cir. 2020) (unpublished per curiam).

## C. Cross-Examination

Redd argues the government engaged in "prosecutorial misconduct" during its cross-examination of him that deprived him of a fair trial. In particular, he insists the government effectively asked him to accuse other witnesses of lying by repeatedly asking if he had "heard" contradictory witness testimony.

Our review is for plain error if a defendant fails to object to a line of questioning during trial. *See United States v. Two Elk*, 536 F.3d 890, 908 (8th Cir. 2008). As the government correctly observes, Redd did not object to prosecutorial misconduct during cross-examination. Thus, plain-error review applies. "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b). "At a minimum, court of appeals

cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993).

"To obtain a reversal" for prosecutorial misconduct, a defendant "must show that the prosecutor made improper remarks that prejudiced his rights in obtaining a fair trial." *United States v. Marin*, 31 F.4th 1049, 1054–55 (8th Cir. 2022). Redd cites a number of out-of-circuit cases for the proposition that the government cannot ask a testifying criminal defendant whether another witness who testified lied. Here, the government never cross-examined Redd about whether another witness lied. Instead, the government asked, for example, whether Redd gave A.E. molly. When Redd testified that he did not, the government asked whether he "heard" A.E. testify that he *did* give her molly. The same pattern continued: the government would ask a question, Redd would provide a response, and the government would ask whether he "heard" testimony to the contrary. On appeal, Redd points to no controlling precedent requiring a district court to sua sponte intervene under these circumstances. *Cf. United States v. Thompson*, 11 F.4th 925, 930 (8th Cir. 2021) (holding the district court did not plainly err in similar circumstances). Thus, we cannot conclude the district court plainly erred by failing to sua sponte intervene during Redd's cross-examination. *See Olano*, 507 U.S. at 734.

## D. Closing Argument

Finally, Redd argues the government's closing argument improperly urged the jury to convict to protect the community and deter future lawbreaking. As Redd concedes, we review this argument for plain error because he did not object during closing argument. Accordingly, "[w]e will only reverse under exceptional circumstances." *United States v. Obi*, 25 F.4th 574, 579 (8th Cir. 2022) (quoting *United States v. Eldridge*, 984 F.2d 943, 947 (8th Cir. 1993)). A prosecutor's remarks during closing argument warrant a new trial if the remarks were improper and the "remarks prejudicially affected the defendant's substantial rights by depriving him of a fair trial." *United States v. Spencer*, 998 F.3d 813, 819–20 (8th Cir. 2021) (quoting *United States v. Alaboudi*, 786 F.3d 1136, 1141 (8th Cir. 2015)).

Redd takes issue with the following portion of the government's closing argument:

> And now it's falling to you, the jurors, for somebody to tell the defendant "no" in a way that actually has some meaningful effect, someone to tell him enough is enough. There will be no more E.N. hiding in the back of a Burger King. There will be no more T.R. shielding her children behind her as he threatens to kill them. There will be no more M.S. running to her house and hiding inside while the defendant sits nearby. And there will be no more A.E., no more women who are drugged, abused, and raped until they comply with the defendant's commands and perform commercial acts for money so that the defendant can profit. No more force, fraud, and coercion. Enough is enough. The evidence here should leave you firmly convinced that the defendant is guilty of three crimes, and at this point, you should find him guilty of those three crimes. Thank you.

These statements concluded the closing arguments.

There was no plain error. While Redd relies on *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992), for the proposition that a prosecutor may not urge the jury to convict so as to protect community values or deter other criminal conduct, this is not what occurred here. Rather, the government referenced Redd's victims, tracking the evidence presented at trial. And although the government stated someone should end Redd's behavior by telling him "no" and "enough is enough," the context was recounting the evidence presented at trial. *See Obi*, 25 F.4th at 580. Indeed, the government concluded by urging the jury to rely on the evidence. The district court did not plainly err by failing to sua sponte correct the government's closing argument.

## III. Conclusion

We affirm the judgment of the district court.

-12-

KELLY, Circuit Judge, concurring.

I concur in the result of the court's opinion. However, I write separately because I disagree with the court's understanding of two things: the government's theory of the case against Redd for sex trafficking by force, fraud, or coercion, 18 U.S.C. §§ 1591(a)(1) and (b)(1), and how the excluded videos of the events at A.E.'s sorority house are relevant to that theory.

The government argued to the jury that the sex trafficking offense began when Redd recruited A.E. at the gas station. As A.E. recounted at trial, in the early morning hours of February 2, 2020, she met Redd at a gas station near campus. She gave Redd her contact information, and Redd gave A.E. the drug molly—she did not have to pay him for it. At trial, the government told the jury that it was Redd who "recruited [A.E.] to work for him. [She] did not go looking for the defendant. He found her at a gas station, and he's read books that say 'choose the right victim.'" And, the government argued, A.E. was "the right victim," someone who "t[ook] drugs from a man she doesn't know in the middle of the night at a gas station." According to the government's theory, the sex trafficking started that night, when he started his efforts to "recruit" A.E. as a prostitute. And, the government said, "he continually contacted her and told her he was a pimp. And when she asked clarifying questions, he was confusing, didn't come right out with it, but just said they needed to meet up." A.E. testified that she would not always respond to his "constant[]" messages, but "it didn't seem like he would leave [her] alone until [she] did meet up with him."

A.E. did not know Redd's true identity. She thought he was "Shawn Cory" because that was his Snapchat name. And the government called out Redd's deception about who he really was—a deception that began before the events in the sorority house and extended long after—as part of his fraud.

About a month after their gas station meeting, A.E. and Redd met up again, this time at her sorority house. Redd brought alcohol, molly, and ecstasy with him,

-13-

and they both took the molly. A.E. testified that after she took it, she felt relaxed, open, talkative, happy and in a good mood. At that point, Redd started asking her personal questions—about her family, her sex life, her birthday. He told her to take off her clothes, and they also had sex. Using a cell phone—initially his own, but later A.E.'s—Redd openly recorded the encounter. The videos are explicit, and they show Redd and A.E. having oral, anal, and vaginal sex. They also capture some of their conversations, which included discussions about A.E. working as a prostitute and how Redd would be her pimp. While Redd admitted to A.E. that his name was not Shawn Cory, he refused to tell her his real name. During closing arguments, the government asserted that Redd filmed these "really embarrassing" videos so he could use them "as a coercive tactic," and "to control her." And the government presented evidence that Redd, in fact, used them that way. After A.E. stopped having sex for money, she never saw Redd again but he "continuously texted her." He told her she owed him money, reminded her that she had "told [him] everything about everything," and told her that he "recorded everything." It made A.E. scared that Redd would release videos of her, and that it would ruin her life.

Thus, the theory of the case that the government argued to the jury was that the sex trafficking offense began with Redd's recruitment of A.E. at the gas station—not at the sorority house a month later. This is also reflected in the Indictment, which charged that Redd committed the trafficking offense "[f]rom in or about February 2, 2020, . . . through in or about March 14, 2020." In this context, the sorority house cell phone videos were relevant because they supported the government's contention that Redd was a pimp who continued to use "fraud" and "coercion" to induce A.E. to prostitute for him. Even if A.E. consented to the *sex* she had with Redd in the sorority house, the government used the fact that Redd made the videos—which included their sexual activity—to show that the pimp-prostitute *relationship* was non-consensual.

Had Redd sought to introduce the videos only to support an argument that A.E.'s consent to the sex in the sorority house meant that she also consented to have sex with someone else for money, or to show that she consented to have sex with

Redd at some later time, I agree that the videos were properly excluded. See United States v. Roy, 781 F.3d 416, 419–20 (8th Cir. 2015). But Redd argues that the videos are evidence that A.E. voluntarily agreed to *prostitute* for him. That is a different question than what the videos show about whether A.E. voluntarily agreed to have sex with Redd at the sorority house. In one of the videos, for example, A.E. said, while having sex with Redd, that "a pimp is the perfect situation for me." She then went on to briefly explain why she was well-suited to having a pimp. Excluding the videos in their entirety kept the jury from hearing conversations between A.E. and Redd that were relevant to Redd's defense that he did not coerce A.E. to engage in prostitution.

That said, I agree that excluding the videos' visual component was not an abuse of discretion. The videos are exceptionally graphic, and they may very well have "divert[ed] the jury's attention from the material issues." United States v. Schave, 55 F.4th 671, 678 (8th Cir. 2022) (quoting United States v. Richardson, 40 F.4th 858, 867 (8th Cir. 2022)). However, the audio[4] of the encounter between Redd and A.E. is different. I recognize that neither party proposed introducing an audio-only version, so the district court was not presented with this decidedly less inflammatory option. But an audio-only version would have allowed the jury to hear evidence directly relevant to a key issue in the case: Did Redd traffic A.E. into prostitution by force, fraud, or coercion? Or did A.E. voluntarily agree to have sex for money, with Redd as her pimp, without the need for force, fraud, or coercion?

---

[4]I see no abuse of discretion in excluding A.E.'s "rough sex" comment—made soon after her comment that a pimp would have been a perfect situation for her—or her statements about past prostitution. These statements go directly to A.E.'s sexual propensity. See Fed. R. Evid. 412(a). Regardless of whether A.E. enjoyed "rough sex," she testified that Redd forced her have sex with him when she did not want to, not just that they had sex that was too rough.

Nevertheless, I concur with the court on the outcome of this case.[5]  Regardless of the evidentiary ruling on the videos, there was adequate evidence that Redd coerced A.E. to engage in commercial sex acts to support his conviction.  See United States v. Johnson, 860 F.3d 1133, 1139 (8th Cir. 2017) ("We will reverse 'only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict.'  We will not reverse a harmless error." (cleaned up) (first quoting United States v. Picardi, 739 F.3d 1118, 1124 (8th Cir. 2014); then citing United States v. Missouri, 535 F.3d 844, 848 (8th Cir. 2008))).

The conversations between A.E. and Redd as captured on the videos might have helped Redd convince the jury that A.E. initially consented to work as a prostitute for him.  But the jury was properly instructed that "[t]he fact that the person may have initially consented or acquiesced does not preclude the finding that

_____

[5]I also concur as to the cross-examination issue because Redd has not established that allowing the prosecution's dozens of questions to Redd about whether he heard what government witnesses said was plain error.  See United States v. Two Elk, 536 F.3d 890, 908 (8th Cir. 2008); United States v. Schmitz, 634 F.3d 1247, 1268, 1270–71 (11th Cir. 2011) (holding defendant had convinced the court that allowing were-they-lying questions was error, but not plain error, and defendant's post-trial challenge on this basis thus failed).  But these questions were nevertheless improper.  On their face, the questions are irrelevant.  What Redd heard in the courtroom does not matter to the case.  See Fed. R. Evid. 401(b).  If we consider the underlying "were-they-lying" inference at the heart of these questions, they are also impermissible.  Counsel did not directly ask Redd if he believed the government's witnesses were lying.  But the thrust of the questions was plainly to force Redd to comment on the credibility of the witnesses' testimony.  These questions improperly placed Redd in a "no-win" situation where he had to "either accuse another witness of lying or undermine his . . . own version of events."  See Schmitz, 634 F.3d at 1269 (citing United States v. Harris, 471 F.3d 507, 511 (3d Cir. 2006)) ("[W]ere-they-lying questions ignore other possible explanations for inconsistent testimony.  Testimony can conflict for many reasons that do not involve a deliberate intent to deceive.").  And they invaded the jury's province. See United States v. Trotter, 837 F.3d 864, 868 (8th Cir. 2016) ("Assessing the credibility of witnesses is a task for the jury." (citing United States v. Malloy, 614 F.3d 852, 861 (8th Cir. 2010))); Schmitz, 634 F.3d at 1269.

the person was thereafter compelled to engage in a commercial sex act. The question is then whether the person at some time later wanted to withdraw but was compelled by force, fraud, or coercion to continue to perform commercial sexual activity." The jury heard ample evidence that, even if A.E. initially consented to the prostitution, she later changed her mind and wanted to withdraw from the business. Yet Redd forced her to continue to engage in commercial sex acts. That is sufficient to support the conviction.[6]

_____

_____

[6]It is also not evident that admitting the videos in their entirety would have influenced the verdict. The government argued that Redd used coercive tactics to convince and pressure A.E. to engage in commercial sex acts for him. Redd argued that A.E. voluntarily consented to working as a prostitute for him. Evidence of both of these theories is on the videos, and it would be up to the jury to decide how, if at all, to factor this evidence into its deliberations.