# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-3567
_____

United States of America

*Plaintiff - Appellee*

v.

Robin Roberts

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: October 19, 2023
Filed: November 17, 2023

_____

Before GRUENDER, STRAS, and KOBES, Circuit Judges.

_____

GRUENDER, Circuit Judge.

A jury found Robin Roberts guilty of sexual abuse of a person physically incapable of declining participation, 18 U.S.C. § 2242(2), and the district court[1] sentenced him to 188 months' imprisonment. He appeals his conviction. We affirm.

---

[1]The Honorable C.J. Williams, United States District Judge for the Northern District of Iowa.

# I.

Roberts and A.B. are both members of the Meskwaki Nation of the Sac & Fox Tribe of the Mississippi in Iowa. After A.B.'s father passed away in 1999, Roberts agreed to serve as her adoptive father. However, Roberts and A.B. had very little contact until A.B. moved back to the Meskwaki Settlement in Iowa in 2018, at which point she began to periodically visit Roberts, help him with errands, and drink alcohol with him. A.B. spent the night at Roberts's house once or twice a month and would barricade herself in an upstairs bedroom because Roberts occasionally made sexual comments to her. On July 8, 2021, A.B. was at Roberts's house along with Roberts's ex-wife Diana Abodeely. The three drank throughout the evening. Around 8:30 p.m., A.B. and Abodeely left to go to a liquor store and to stop off at Abodeely's apartment. When they returned, Roberts was asleep on the couch in his living room. They helped him into his bed, and Abodeely, at A.B.'s request, spent the night at Roberts's with A.B. on the living room couch. A.B. did not sleep in her usual room because it was packed with clutter.

The next morning, Abodeely left for work. After she left, Roberts returned to the living room and A.B. went back to sleep. A.B. awoke to Roberts performing oral sex on her. A.B. called 911 and said she "didn't think [Roberts] realized what was going on." Sergeant Kole Northland with the Meskwaki Nation Police Department soon arrived at Roberts's house.

Sergeant Northland entered the house and asked Roberts several questions. The interaction was recorded on Sergeant Northland's body-worn camera, three excerpts from which were admitted at trial. In the first excerpt, Sergeant Northland asked Roberts why A.B. had called the police and Roberts shrugged in response. In the second excerpt, Roberts stated that A.B. "woke up, I don't know if she woke up," and he further stated that A.B. said, "You're raping me. You're my father." Roberts also stated that A.B. should have been wearing a bra and underwear. In the third excerpt, Sergeant Northland summarized: "so while you were going down on her, and you're licking her vagina, she woke up and got mad." Roberts replied, "yup."

Sergeant Northland also talked with A.B. She told him that he had pretty eyes, looked like Luke Bryan, and that she wished they could have met under different circumstances. Roberts was then transported to the police station for a recorded interview.

At trial, the Government called two witnesses, M.R. and C.F., to testify about how Roberts had previously sexually assaulted them. M.R. testified that after waking up to Roberts having sex with her, she fought him off and fled his home. C.F. testified that, despite once waking up to Roberts performing oral sex on her, she continued to live with him. Then, during cross examination, Roberts questioned A.B. about her statements to Sergeant Northland. In rebuttal, the Government called expert witness Holly Elliott to testify about how people behave after experiencing trauma. Elliott testified that four main responses to trauma exist: fight, flight, freezing, and fawning. She further stated that A.B.'s actions were an example of fawning, M.R.'s actions were an example of flight, and C.F.'s actions were an example of freezing.

At the instruction conference, the Government objected to Roberts's proposed intoxication jury instruction. After hearing from both the Government and Roberts, the district court refused the instruction, finding that there was evidence of drinking but not enough evidence for a jury instruction on intoxication. The jury returned a guilty verdict, and the district court sentenced Roberts to 188 months' imprisonment.

## II.

Roberts raises three arguments on appeal. We address each in turn.

### A.

Roberts first argues that the district court abused its discretion in allowing Elliott to testify about the specific trauma responses of A.B., M.R., and C.F. "Evidentiary rulings are reviewed for abuse of discretion, and we afford deference

to the district judge who saw and heard the evidence." *United States v. Johnson*, 860 F.3d 1133, 1139 (8th Cir. 2017) (quoting *United States v. Espinosa*, 585 F.3d 418, 430 (8th Cir. 2009)).

"A wall of precedent" in this circuit establishes that an expert may properly testify about responses to sexual assault, so long as they do not "diagnose [someone] as [a] victim[] of sexual abuse," *United States v. Zephier*, 989 F.3d 629, 635 (8th Cir. 2021), or "express[] an opinion that sexual abuse has in fact occurred," *Johnson*, 860 F.3d at 1141. This is because "some post-abuse behavior . . . may seem counterintuitive, so expert testimony will allow jurors to evaluate the alleged victim's behavior and assess [] credibility by understanding how individuals generally react to sexual abuse." *Zephier*, 989 F.3d at 635 (internal quotation marks omitted); *see also United States v. Kirkie*, 261 F.3d 761, 766 (8th Cir. 2001) (explaining that such testimony assists the jury by helping it to understand the evidence).

However, Elliott's testimony "came close to the line" of improper vouching. *Zephier*, 989 F.3d at 635; *see also Bass v. United States*, 655 F.3d 758, 761 (8th Cir. 2011) ("Improper vouching may occur when the government expresses a personal opinion about credibility, implies a guarantee of truthfulness, or implies it knows something the jury does not." (quoting *United States v. Roundtree,* 534 F.3d 876, 880 (8th Cir. 2008))). She testified that A.B.'s statements to Sergeant Northland about having pretty eyes and looking like Luke Bryan were "an example of fawning." Elliott was asked: "if we saw someone exhibiting fawning behavior, would the research suggest that that does mean the trauma happened?" She replied: "[i]t would suggest that that's a normal response to trauma." She testified that M.R.'s behavior was consistent with the "flight" trauma response and that C.F.'s behavior was consistent with the "freeze" trauma response. *Cf. Johnson*, 860 F.3d at 1141 (concluding that no vouching had occurred because expert witness "did not suggest that D.M.'s behavior is consistent with the behavior of victims of domestic physical and sexual assault in general"). When asked whether the three different responses to trauma are "inconsistent with the trauma taking place," she replied,

"[t]he exact opposite actually." *Cf. id.* (concluding no vouching had occurred because expert witness "did not express any opinion on the truthfulness of D.M.'s testimony").

Nonetheless, any error in allowing Elliott's testimony was harmless. At most, her vouching was indirect. She did not "testif[y] that the victim was telling the truth (or almost certainly telling the truth) that sexual abuse in fact occurred." *See United States v. Belt*, 61 F.4th 594, 596 (8th Cir. 2023) (distinguishing expert testimony from vouching); *see also United States v. Azure*, 801 F.2d 336, 339-40 (8th Cir. 1986) (holding that it was an abuse of discretion to allow a pediatrician's expert testimony that the victim was "believable" and "telling the truth"). On cross examination, Elliott agreed with the statement that "everything and anything can be consistent with being a victim of sexual abuse" and was unable to think of a behavior that would suggest sexual abuse did not happen, undercutting the impact of her earlier testimony. Elliott was not a part of the Government's case-in-chief, but was instead a rebuttal witness in response to Roberts's cross examination of A.B. Moreover, Roberts made several inculpatory statements to Sergeant Northland from which the jury could have independently concluded that Roberts had sexually assaulted A.B.

As any potential vouching did not have "more than a slight influence on the verdict," *United States v. White*, 557 F.3d 855, 858 (8th Cir. 2009), the district court committed at most harmless error in admitting Elliott's testimony.

B.

Roberts next argues that the district court erred in not giving an intoxication instruction to the jury. "In reviewing jury instructions, we examine whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Bady v. Murphy-Kjos*, 628 F.3d 1000, 1004 (8th Cir. 2011) (internal quotation marks omitted). "We afford the district court broad discretion in instructing the jury." *Id.*

(internal quotation marks omitted).  "A criminal defendant is entitled to an instruction on a theory of defense only if there is adequate evidence in the record to justify it."  *United States v. Phelps*, 168 F.3d 1048, 1056 (8th Cir. 1999).  "An intoxication instruction should not be given if it lacks evidentiary support or is based on mere speculation."  *Id.*

There was evidence that Roberts had been drinking during the evening of July 8.  Abodeely and A.B. both testified that he had been drinking heavily that night.  The following morning, when Sergeant Northland questioned Roberts, there were opened bottles of alcohol in the living room of Roberts's house.  On the 911 call, A.B. had said she "didn't think [Roberts] realized what was going on."  However, there is insufficient evidence to support a finding that Roberts was intoxicated on the morning of July 9 when he sexually assaulted A.B.  When Sergeant Northland arrived, only two bottles of Redd's hard cider and a few cans of Bud Light were open in the living room, with the remaining alcohol unopened.  A.B. and Abodeely left Roberts's house at 8:30 p.m. on July 8, and he was asleep when they returned.  When questioned by Sergeant Northland, Roberts was "able to understand questions asked of him," "answered in a lucid way," and "understood what was going on."  Thus, the instructions fairly and adequately submitted the issues in the case to the jury.  *See id.* ("[A]lthough there was some evidence that [defendant] had been drinking, the evidence would not support a finding that he was intoxicated.").

## C.

Finally, Roberts argues that the district court erred in not admitting under the rule of completeness certain statements he made to Sergeant Northland and later during the recorded interview.  *See* Fed. R. Evid. 106.  "In considering claims of evidentiary error in applying Rule 106, we . . . will find error only if there has been a clear abuse of discretion."  *United States v. Ramos-Caraballo*, 375 F.3d 797, 802 (8th Cir. 2004).

Under Federal Rule of Evidence 106, when a party "introduces all or part of a writing or recorded statement, an adverse party may require the introduction . . . of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. However, "this right does not entitle the defendant to introduce portions of his statement that are neither explanatory of nor relevant to those portions of the statement introduced by the prosecution." *United States v. Smith*, 794 F.2d 1333, 1335 (8th Cir. 1986). Moreover, Rule 106 "does not empower a court to admit unrelated hearsay in the interest of fairness and completeness when that hearsay does not come within a defined hearsay exception." *Ramos-Caraballo*, 375 F.3d at 803 (internal quotation marks omitted).

Roberts's statements were not necessary to alleviate a misleading impression but were instead self-serving hearsay. The district court properly found that Roberts had failed to explain what was misleading about the admitted portions of Sergeant Northland's questioning and Roberts's later interview such that additional context was needed, noting that the "statements may provide a fuller version of defendant's exculpatory version of events, but that does not make the inculpatory portions the government intends to play misleading." Furthermore, none of the hearsay statements came within a defined hearsay exception. *See id.* Roberts argues that we need not follow *Ramos-Caraballo* because a December 2023 amendment to Rule 106 will allegedly eliminate the requirement that information admitted under the rule of completeness also fit within a hearsay exception. However, that amendment was not in effect when the district court ruled, nor is it now in effect. We cannot hold that the district court abused its discretion in applying controlling circuit precedent.

**III.**

For the foregoing reasons, we affirm Roberts's conviction.

_____